**ALEXANDER & ALEXANDER, INC.**

v.

**Benjamin R. DRAYTON**
and
**Warren & Welsh Company.**

**Civ. A. No. 74–1114.**

United States District Court,
E. D. Pennsylvania.

July 2, 1974.

John P. O'Dea, of Stradley, Ronon, Stevens & Young, Philadelphia, Pa., for plaintiff.

Robert J. Spiegel, and Spencer Ervin, of Gratz, Tate, Spiegel, Ervin & Ruthrauff, Philadelphia, Pa., for Benjamin R. Drayton.

Jerome E. Ornsteen, of Fox, Rothschild, O'Brien & Frankel, Philadelphia, Pa., for Warren & Welsh Co.

## OPINION

HIGGINBOTHAM, District Judge.

The plaintiff, Alexander & Alexander, seeks a judicial decree enforcing specific performance of a restrictive covenant contract which by its terms precludes defendant Benjamin R. Drayton (plaintiff's former assistant vice-president) from engaging in activities in competition with plaintiff's business enterprise. Having carefully considered the testimony of the preliminary injunction hearing and after inspecting the various exhibits admitted into evidence, I find that plaintiff is entitled to injunctive relief.

### I.

### *Findings of Fact*

A. *The Parties*

(1) Plaintiff Alexander & Alexander, Inc. is a corporation organized and existing under the laws of the State of Maryland with its principal place of business in a state other than the Commonwealth of Pennsylvania. It is engaged in the insurance brokerage and agency business in the Philadelphia area.

(2) The defendant, Benjamin R. Drayton, is presently 52 years of age and is a citizen of the Commonwealth of Pennsylvania. From on or about June 1, 1965 to October 1, 1967, Drayton was a partner in the firm of Lukens, Savage & Washburn and had engaged in the insurance brokerage and agency business primarily in the areas of Philadelphia and New York.

(3) Prior to October 1, 1967, Alexander & Alexander, Inc. and Lukens, Savage & Washburn competed in the insurance business.

(4) On or about September 29, 1967, the partners of Lukens, Savage & Washburn, including the defendant Drayton entered into an Agreement which is attached as Exhibit "A" to the Complaint in this action.

(5) This Agreement was executed by all of the partners of Lukens, Savage & Washburn, including Drayton and representatives of Alexander & Alexander, Inc. The consideration to which reference is made in said Agreement was paid to Lukens, Savage & Washburn at the time of settlement on or about October 2, 1967.

(6) Pursuant to the terms and conditions of the Agreement between Lukens, Savage & Washburn and Alexander & Alexander, Inc. the defendant Drayton was employed by Alexander & Alexander in its Philadelphia office and was an assistant vice-president of Alexander & Alexander, Inc. at all times from October 1, 1967 to April 30, 1974 at which time his employment with Alexander & Alexander, Inc. was terminated. On April 11 or 12, 1974, Drayton accepted an offer of employment made by defendant Warren and Welsh Company.

(7) Warren & Welsh Company is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania with its principal place of business at the Irwin Building, King of Prussia, Pennsylvania. It is engaged in the insurance brokerage and agency business and is a competitor of Alexander & Alexander in the Philadelphia area.

(8) The Agreement between Alexander & Alexander, Inc. and Lukens, Savage & Washburn dated September 29, 1967 was negotiated by the Standing Committee of Lukens, Savage & Washburn.

(9) Pursuant to the Agreement, Alexander & Alexander purchased the insurance accounts, customer accounts, expiration lists and other good will of Lukens, Savage & Washburn for a consideration of $300,000, which was paid in cash at the time of settlement.

(10) Pursuant to the Agreement, Alexander & Alexander paid approximately $90,000 for all of the common stock of Lukens, Savage, Parker & West.

(11) Pursuant to the Agreement, the former partners of Lukens, Savage & Washburn, including Drayton, became employees and stockholders of Alexander & Alexander.

(12) Pursuant to the Agreement, the defendant Drayton became an Assistant Vice-President with Alexander & Alexander.

(13) Pursuant to Paragraph 19 of the Agreement between Alexander & Alexander and Lukens, Savage & Washburn dated September 29, 1967, the defendant Drayton was paid a bonus of $1,500 by Alexander & Alexander, Inc.

(14) As a result of the Agreement between Alexander & Alexander, Inc. and Lukens, Savage & Washburn dated September 29, 1967, the defendant Drayton realized a net long-term gain from sale of capital assets in the amount of $7,564.

(15) At the commencement of the fiscal year of Lukens, Savage & Washburn on May 31, 1968 the defendant Drayton's capital account has a credit in the amount of $32,858., which consisted in part, of a $25,000 capital contribution which had been made by the defendant Drayton.

(16) The defendant Drayton exercised the option set forth in Paragraph 14 of the Agreement between Alexander & Alexander and Lukens, Savage & Washburn and acquired 70 shares of Class C common stock of Alexander & Alexander at a price of $85. per share for a total consideration of $5,950. After several stock splits, the stock purchased by the defendant Drayton is now 5600 shares and is traded over the counter with its current market value being approximately $128,000.

(17) From October 1, 1967 until approximately April 18 or April 19, 1974, the defendant Drayton was employed exclusively by Alexander & Alexander, Inc. in its insurance and brokerage business.

(18) The scope of the employment of the defendant Drayton by Alexander & Alexander, Inc. included, *inter alia,* the sale and service of insurance for which the defendant Drayton was paid by Alexander & Alexander, Inc. during the time of his employment.

(19) During the calendar year 1973, Alexander & Alexander, Inc. received commission income from approximately 276 separate accounts sold and/or serviced by the defendant Drayton. The gross commission income to Alexander & Alexander during 1973 from business either sold and/or serviced by the defendant Drayton was $125,812.92.

(20) During the course of his employment by Alexander & Alexander, Inc. the defendant Drayton came into possession of records of customer accounts, customer lists, expiration lists, production records, and other customer information pertaining to the customer accounts of Alexander & Alexander.

B. *The Agreement*

(21) Paragraph 25 of the Lukens, Savage & Washburn-Alexander & Alexander merger Agreement states as follows:

"25. Upon the termination of employment any Partner entitled to receive the termination payments described in Paragraph 24 will not directly or indirectly own, manage, or operate, in whole or in part, or as an officer, employee, agent, broker, solicitor, partner, stockholder, director, trustee, creditor or otherwise be connected with an insurance agency, brokerage, solicitor or consultant business or actuarial or employee benefit reporting business within any point less than one hundred (100) miles from the city limits of Philadelphia, Pennsylvania, New York, New York, Boston, Massachusetts, or any city where Partner was employed by A & A on a permanent basis at any time within three (3) years prior to his termination of employment, until he receives the last termination payment under the aforesaid Paragraph 24. This paragraph shall not prohibit ownership of a minority interest in capital stock of a company whose shares are publicly traded if the Partner in question does not participate in the operation of such company."

(22) Paragraph 26 of the Lukens, Savage & Washburn-Alexander & Alexander merger Agreement states as follows:

"26. Upon termination of employment any Partner entitled to receive the termination payments described in Paragraph 24 will not directly or indirectly own, manage, or operate, in whole or in part, or as an officer, employee, agent, broker, solicitor, partner, stockholder, director, trustee, creditor, or otherwise be connected with an insurance agency, brokerage, solicitor or consultant business or actuarial or employee benefit reporting business in any location which solicits or accepts business from customers or accounts of A & A or of any corporation or other business entity controlled by A & A directly or indirectly, until he receives the last termination payment under the aforesaid Paragraph 24. This paragraph shall not prohibit ownership of a minority interest in the capital stock of a company whose shares are publicly traded if the Partner in question does not participate in the operation of such company."

(23) Paragraph 24 of the Merger Agreement states in part as follows:

"24. Upon termination of employment with A & A for any reason, including but not limited to death or retirement, Partners shall receive payments in accordance with the provisions of Exhibit "H", attached hereto. After settlement, Retired Partners shall receive those payments provided for them by Exhibit "H". All such

payments shall be made during the appropriate period not less frequently than at quarterly intervals.

(24) The defendant Drayton is a partner entitled to receive the termination payments described in Paragraph 24 of the Agreement between Alexander & Alexander and Lukens, Savage & Washburn and is entitled to receive payments pursuant to Exhibit "H" of that Agreement for the next ten years.

### C. *Drayton's Employment Termination*

(25) Drayton became dissatisfied with his employment at Alexander & Alexander, and on March 29, 1974, he met with Warren & Welsh Company to discuss employment with Warren & Welsh Company.

(26) Drayton met again with Warren & Welsh Company on April 3, 1973 at which time Warren & Welsh made an offer of employment to him.

(27) During the course of his employment by Alexander & Alexander and while he was an officer of Alexander & Alexander the defendant Drayton came into the possession of customer lists of Alexander & Alexander including P–12, P–11, and P–17.

(28) The customer lists which have come into the possession of the defendant Drayton contained both the names and addresses of Alexander & Alexander customers and the amount of commission income derived from those customers during the time Drayton was employed by Alexander & Alexander.

(29) During the course of his employment by Alexander & Alexander the defendant Drayton received regularly expiration notices of those insurance customers of Alexander & Alexander whose insurance was about to expire.

(30) During April, 1974 Drayton contacted a number of the insurance customers of Alexander & Alexander and attempted to induce them to give their insurance business to him and Warren & Welsh Company.

(31) All of the customers contacted by Drayton were former customers of Lukens, Savage & Washburn and were accounts sold and/or serviced by the defendant Drayton on behalf of Alexander & Alexander after the Lukens, Savage & Washburn-Alexander & Alexander merger.

(32) On April 3, 1974 Drayton reviewed with Warren & Welsh Company customer lists of Alexander & Alexander which came into his possession during the course of his employment as an officer of Alexander & Alexander, Inc.

(33) Drayton's employment with Alexander and Alexander was terminated on April 30, 1974.

### II. *Legal Discussion*

### A. *Parole Evidence Rule Issues*

As to the relevant issues in this case, contract provisions 24, Exhibit H, 25, 26, and 27 preclude defendant Drayton for ten years from competing with plaintiff ". . . within any point less than (100) miles from the city limits of Philadelphia, Pennsylvania, New York, New York, Boston, Massachusetts or any city where Partner was employed by A & A on a permanent basis at any time within three (3) years prior to his termination of employment . . ." [Paragraph 25] or ". . . in any location which solicits or accepts business from accounts or customers . . ." of plaintiff [Paragraph 26] ". . . until he receives the last termination payment under . . . paragraph 24." [Paragraphs 25 and 26]. Paragraph 27 provides:

> "27. If a Partner after termination violates any provision of Paragraph 25 or 26, A & A may after learning of such violation discontinue his termination payments, in which event A & A shall be released of any and all further obligations in connection therewith."

Drayton insists that by reason of Paragraph 27, *supra,* plaintiff's exclusive and sole remedy is the discontinuance of termination payments pursuant to Paragraph 27, and thus plaintiff is not entitled to any supplemental injunctive relief. In the alternative Drayton asserts that the intention of the parties

was to eliminate from plaintiff any option for injunctive relief, and that therefore Drayton can introduce parole evidence to establish an intention contrary to the language of the agreement.

■ The rule in Pennsylvania is unyielding that "in the absence of fraud, accident, or mistake, parol evidence of a prior or contemporaneous oral representation or agreement which varies, modifies, or conflicts with a complete written agreement is inadmissible in evidence." Morgan v. Phillips, 385 Pa. 9, 13, 122 A.2d 73, 75 (1956); 14 Pennsylvania Law Encyclopedia § 269 (1959).

■ As I read Paragraph 27 there is no ambiguity; it does not limit plaintiff's rights solely to discontinuing Drayton's termination payments. Paragraph 27 merely gives plaintiff that option which, if exercised by the discontinuance of Drayton's termination payments, plaintiff thereafter would not have any further obligations to or rights against defendant Drayton. But Paragraph 27 does not rule out injunctive relief. There is no ambiguity in the contract on this issue, and there is no evidence which has been proffered even to suggest fraud, accident or mistake.

In Bettinger v. Carl Berke Associates, Inc., 455 Pa. 100, 314 A.2d 296, 297, 298 (1974) the covenantee made a similar argument attempting to preclude the covenantor from injunctive relief:

> "Appellant Berke next alleges that the provision in his contract that called for damages (the forfeiture of all commissions due him), if he breaches the restrictive covenant, constituted appellee's sole remedy, thus barring appellee from seeking an injunction against him. This argument is without merit. The contract in question did not state that appellee was limited to the single remedy of damages, nor would it be logical that such would be the case. Appellee was seeking protection from Berke's competition and this would not be afforded by damages only. See Roth v. Hartl, 365 Pa. 428, 75 A.2d 583

(1950); Restatement of Contract. See 378, 384(2) (1932)."

Drayton's position here is no different than that of appellant Berke, *supra*, and similarly, Drayton's argument is without merit.

*Validity of the Restrictive Covenant*

At the outset, it must be emphasized that defendant Drayton's position is not comparable to those cases where untrained or unskilled employees were subjected to rigid restrictive covenants to not compete—even though the latter restrictions have often been held to be valid. Drayton is not here the exploited employee; rather he is an adroit, successful businessman who seven years ago thought that it would be highly advantageous to him to sell his share of a partnership to Alexander & Alexander. Seven years ago Drayton himself was an employer, and along with his other partners, sold his partnership interest to Alexander & Alexander for a gross cash settlement of $300,000. Additionally, Drayton benefited from a lucrative stock option provision whereby he was permitted to purchase 70 shares of Class C common stock in Alexander & Alexander at approximately $85 per share for a total consideration of $5,950, which stock today is traded over the counter with a current market value of approximately $128,000. Thus, the language in Morgan's Home Equipment v. Martucci, 390 Pa. 618, 136 A.2d 838, 846 (1957) is particularly applicable.

> "General covenants not to compete which are ancillary to the sale of a *business* serve the asset known as "good will" which the purchaser has bought. Indeed, in many businesses it is the name, reputation for service, reliability, and the trade secrets of the seller rather than the physical assets which constitute the inducements for a sale. Were the seller free to re-enter the market, the buyer would be left holding the proverbial empty poke. When restrictive covenants are limited to the area of potential competition with the purchaser and limited in time to the period required for the

purchaser to establish his own customer following, then they are enforcible although a partial restraint upon the free exercise of trade.

"Quite different reasons motivate the upholding of covenants not to compete which are ancillary to employment."

\* \* \* \* \* \*

"In view of this greater hardship imposed upon an employe, general covenants not to compete which are ancillary to employment will be subjected to a more stringent test of reasonableness than that which is applied to such restrictive covenants ancillary to the sale of a business. Restatement, Contracts, § 515(b), comment b (1932); Annotations, 1955, 43 A.L.R. 2d 94, 111, 1955, 41 A.L.R.2d 15, 30."

In *Bettinger, supra,* the most recent analysis of restrictive covenant provisions, the Pennsylvania Supreme Court reaffirmed the doctrine in Jacobson and Company v. International Environment Corporation, 427 Pa. 439, 235 A.2d 612, 620 (1967) that:

". . . employment contracts containing general covenants by an employee not to compete after the termination of his employment are prima facie enforceable if they are reasonably limited as to duration of time and geographical extent . . . within such territory and during such time as may be reasonably necessary for the protection of the employer." 314 A.2d at 298.

There the Court also reaffirmed the classic three-pronged test adopted in *Jacobson, supra*:

"The covenant must be (1) reasonable in time, (2) reasonable as to geographical extent, and (3) otherwise reasonably necessary to protect the employer, without imposing an undue hardship on the employee." 314 A.2d at 298.

In a series of cases the Pennsylvania Supreme Court has sanctioned the Chancellor modifying either the time or the geographic scope of restrictive covenants —when the chancellor viewed the contract as precluding too broad a geographic area or where it was indefinite as to time prohibitions. Jacobson & Company, Inc. v. International Environment Corp., *supra*; Morgan's Home Equipment Corp. v. Martucci, *supra*; Barb-Lee Mobile Frame Co., Inc. v. Hoot, 416 Pa. 222, 206 A.2d 59 (1965). *See,* Monongahela River Consolidated Coal & Coke Co. v. Jutte, 210 Pa. 288, 59 A. 1088 (1904):

"Where the agreement contains no limitation on the area of territory covered, or (alternatively) contains no time limitations the courts will sustain the contract if in view of attendant circumstances they can interpret it as providing for reasonable limitation." Plunkett Chemical Co. v. Reeve, 373 Pa. 513, 95 A.2d 925, 926 (1953); Seligman and Latz of Pittsburgh v. Vernillo, 382 Pa. 161, 114 A. 2d 672, 674 (1955).

This capacity of the Pennsylvania law has been called by Justice Musmanno "The unique virtue of equity . . . [to] rehabilitate legally wrecked principles." Barb-Lee Mobil Frame Co. v. Hoot, 416 Pa. 222, 206 A.2d 59, 60 (1965). Thus there is ample authority supporting a Chancellor's "fair modification" of restrictive covenant. *Barb-Lee Mobil Frame Co., supra* at 61.

From the plethora of cases cited by the parties and from our independent research revealing many additional cases, we find the Pennsylvania Courts on many occasions have put in time or geographic limitations. While no case has been found where the Chancellor felt that *both* the time *and* the geographic limitations were too broad, I find no equitable principle which precludes modification of each component.[1]

1. *But cf.* Reading Aviation Service v. Bertolet, 454 Pa. 488, 311 A. 628, 630, 631 (1973), wherein Justice Pomeroy discusses the limitations of a court's power to partially enforce unreasonably broad restrictive covenants. The present case is distinguishable, for I find that the time and geographic prohibitions here were reasonable at the time the contract was executed although change of circumstances during the seven

There is a certain elusiveness when one tries to apply any prior restrictive covenant cases to the current factual situation. This elusiveness is unavoidable, because necessarily reasonableness is dependent upon an analysis of the facts of a specific case; and since the factual terrain of other cases vary, they cannot constitute a precise map for adjudication of the current issues. Though the courts have categorized separately the three components, reasonableness of time, reasonableness as to geographic extent and "otherwise reasonably necessary to protect the employer, without imposing undue hardship on the employee", *Bettinger, supra,* 314 A.2d at 298, each of these components are in some respect interdependent for each component affects the other. Thus, reasonableness in time or reasonableness in geographic extent are not separate constellations to the other balancing test of weighing the protection of the employer against an undue hardship on the employee. It is the latter component of "otherwise reasonably necessary to protect the employer without imposing an undue hardship on the employee" which highlights the analytical problems in this case.

When plaintiff purchased defendant Drayton and his partner's business, Lukens, Savage and Washburn, plaintiff's $300,000 investment could have been exposed to an extraordinarily devastating risk if there was not some long-term protection against immediate competition by the sellers of the partnership. For, despite the hoopla with which insurance brokers deluge the public, there are many insurance brokerage and agency businesses which offer substantially equivalent and competitive service. Thus, the decisive factor in selling insurance or selling brokerage and agency service is often the close personal contact and experience of the individual broker or salesman and not that his product is manifestly superior to the rest of the competitors.

Plaintiff purchased Lukens, Savage & Washburn in 1967. If within a year after that purchase all of the former partners of Lukens, Savage & Washburn had resigned from plaintiff and had gone out to compete against plaintiff, then plaintiff's $300,000 investment would have only a slight or at least a greatly reduced value. Thus, within the context of the original agreement in 1967, during the early years it was essential to protect plaintiff's interest when purchasing Drayton's and the others' business to have a ten-year non-competition clause. At that time, in 1967, this prohibition was reasonable in time and in geographic area and further, it was particularly necessary to protect the employer and did not impose an undue hardship on the employees who had profited handsomely by their sale of the business to the plaintiff. Now, the issue of reasonableness must be viewed with a recognition that years have passed since the business was purchased. From this different perspective one must ask whether a ten year preclusion is still necessary to protect the employer and whether it imposes an undue hardship on Drayton. Drayton is now 52 years old. If he were now precluded from competing for the next ten years, for all practical purposes he would have no real option to start anew a successful, viable insurance business, for then he would face the world of 1984 seeking a new job or options hampered by a ten-year void of contacts and the disadvantage of age 62. He would be seeking employment then from an agency where many employers would be retiring his age bracket and seeking new men of resiliency and gusto to confront the perpetual challenge of this vigorously competitive business.

Thus, I find that enforcement of the restrictive covenant for a ten year period would be unreasonable in time, would impose an undue hardship on the employee and is not reasonably necessary to protect the employer. Similarly,

---

year period between the execution of the contract and Drayton's termination make partial enforcement the more equitable rem-

edy. Also the contract terms here modified are divisible. See paragraph 28 and Exhibit H of the September 29, 1967 agreement.

I find that there is no necessity to protect plaintiff's business to extend the geographic prohibition more than 100 miles outside of Philadelphia. However, in view of the testimony I have heard about the nature of the industry, the type of policies it offers, the fact that many of them are extended yearly (though some for longer periods of time) the applicable cases warrant a modification of the present restrictive covenant to only preclude Drayton for a period of two years from competing against plaintiff in an area within one hundred miles from the city of Philadelphia.

*Trade Secret Issues*

Additionally plaintiff seeks injunctive relief against defendants to preclude their competitive use of any customer lists, lists of insurance policy expiration dates, or other records of plaintiff's insurance accounts. The seminal case on the Pennsylvania law of trade secrets is Macbeth-Evans Glass Co. v. Schnelbach, 239 Pa. 76, 86 A. 688 (1913) which as reaffirmed in the more recent Pennsylvania Supreme Court pronouncement of Morgan's Home Equipment Corp. v. Martucci, 136 A.2d 838, *supra*, at 842 states:

" 'It may now be accepted as settled law, under the authority of English and American cases, that courts of equity if the facts warrant, will restrain an employee from making disclosure or use of trade secrets communicated to him in the course of a confidential employment. *The character of the secrets, if they be peculiar and important to the business, is not material.* They may be secrets of trade, * * * or any other secrets important to the business of the employer. They, however, must be the particular secrets of the complaining employer, not general secrets of the trade in which he is engaged * * *. The duty of the servant not to disclose the secrets of the master may arise from an express contract, or it may be implied from their confidential relations.

" ' * * * *Where confidence is reposed, and the employe by reason of the confidential relation has acquired knowledge of trade secrets, he will not be permitted to make disclosure of those secrets to others to the prejudice of his employer.'* (Emphasis supplied.)"

The factual circumstances upon which the decision in *Morgan's Home Equipment Corp., supra,* was rendered very closely approximate the evidentiary matrix of the present case. There the plaintiff purchased the assets of a company engaged in the business of selling household articles by installment contract through door to door salesmen-collectors. The purchase price included customer lists and good will. The defendants were employees from the recently purchased company, newly hired by the buyer, who had subsequently left the buyer's employ and were soliciting customers for a competing company in breach of a restrictive covenant agreement. They began to solicit and serve customers on their former routes and the buyer instituted an action to enjoin the breach of the restrictive covenant and the competitive use of customer information by the former employees and their new employer. Justice Cohen writing for the Pennsylvania Supreme Court stated:

"In many businesses, permanent and exclusive relationships are established between customers and salesmen. The customer lists and customer information which have been compiled by such firms represent a material investment of employers' time and money. This information is highly confidential and constitutes a valuable asset. Such data has been held to be property in the nature of a 'trade secret' for which an employer is entitled to protection, independent of a nondisclosure contract, either under the law of agency, or under the law of unfair trade practices." 136 A.2d at 842.

The Court in affirming the chancellor's judgment granting injunctive relief went on to conclude:

> "We agree that confidential customer data are entitled to protection as a trade secret within the meaning of the Macbeth-Evans rule.

> " \* \* \* Whether this information was embodied in written lists or committed to memory is, we believe, of no significance; in either case the data are entitled to protection.

> "All the defendants were given customer data in the course of their employment with Morgan and its predecessor, and all admit to using and divulging the information subsequently in their rival employment. We hold, therefore, that independent of the covenants executed between Morgan and its former employees, the lower court properly directed Martucci, Dan Spiller, and Morris Spiller to account for all profits obtained from the disclosure of confidential customer information." (Footnotes omitted.) 136 A. 2d at 842, 843.

█ Defendant contends that the records in question should not be afforded the judicial protection of a prohibitive injunction because of Alexander & Alexander's policy of disclosing the names of certain customers in the course of soliciting new accounts. Although the limited publication of customer lists by Alexander & Alexander is not necessarily inconsistent with its claim of secrecy, under Pennsylvania law widespread publication and advertising destroys the right to maintain a cause of action founded upon a breach of duty not to disclose such information. Van Products Co. v. General Welding and Fabricating Co., 419 Pa. 248, 213 A.2d 769, 780 (1965). This latter defense of widespread publication might present a significant issue on the present record if my inquiry were confined solely to Drayton's competitive use of the list of customer names on the accounts he had produced and serviced during his employment with plaintiff. However, the threat of disclosure and competitive use of customer information encompasses not only the names of certain Alexander & Alexander customers but also the expiration dates of insurance contracts with these customers and the amount of income generated by their individual accounts. Such customer information is clearly peculiar and important to plaintiff's business enterprise for a rival insurance agency armed with such premium data and the expiration dates of the policies of Alexander & Alexander would clearly gain a significant competitive advantage in soliciting the accounts of the customers in question. I therefore conclude that the customer information at issue in this case constitutes trade secrets under Pennsylvania law and that the limited publication by Alexander & Alexander as established on the record of this case does not preclude injunctive relief against further disclosure and competitive use of this information.

## CONCLUSIONS OF LAW

(1) The Alexander & Alexander-Lukens, Savage & Washburn Agreement of September 29, 1967 embodies the entire understanding among the parties relating to the restrictive covenant not to compete.

(2) The intent of the parties concerning the sale of the Lukens, Savage & Washburn business to Alexander & Alexander and the employment of the Lukens, Savage & Washburn partners, including the defendant Drayton, can be clearly ascertained from the Agreement.

(3) The parties did not intend the optional remedy set forth in Paragraph 27 of the Agreement to be the sole and exclusive remedy available to Alexander & Alexander for breach of the restrictive covenant provisions of the Agreement.

(4) The restrictive covenants contained in Paragraphs 25 and 26 of the Alexander & Alexander-Lukens, Savage & Washburn merger Agreement were *prima facie* reasonably necessary to protect Alexander & Alexander from competition for the accounts which had been sold to Alexander & Alexander by former Lukens, Savage & Washburn part-

ners such as the defendant Drayton after the merger.

(5) The plaintiff Alexander & Alexander will suffer irreparable injury unless the covenant-not-to-compete provisions of Paragraph 25 and/or 26 of the Lukens, Savage & Washburn-Alexander & Alexander Agreement are enforced.

(6) The plaintiff Alexander & Alexander does not have an adequate remedy at law for breach of the restrictive covenant provisions of the Agreement.

(7) Defendant Drayton's employment by Warren & Welsh Company will be in violation of Paragraphs 25 and 26 of the Alexander & Alexander-Lukens, Savage & Washburn merger Agreement.

(8) The covenant not-to-compete-provisions of the Lukens, Savage & Washburn-Alexander & Alexander Agreement of September 29, 1967 is ancillary to the sale of the Lukens, Savage & Washburn business, by the partners thereof, including the defendant Drayton to Alexander & Alexander.

(9) The geographic scope of the covenants not to compete set forth in Paragraph 25 and/or 26 of the Alexander & Alexander-Lukens, Savage & Washburn merger Agreement are unreasonably broad under the present circumstances, though in 1967 this prohibition would have been reasonable if plaintiffs were then seeking relief.

(10) The ten-year time duration of the covenants not to compete set forth in Paragraphs 25 and 26 of the Alexander & Alexander-Lukens, Savage & Washburn merger Agreement is unreasonable under the present circumstances, though in 1967 this prohibition would have been reasonable if plaintiffs were then seeking relief.

(11) Under the present circumstances a two year duration of the covenant not to compete set forth in Paragraphs 25 and 26 constitutes a restraint reasonably necessary to protect Alexander & Alexander without imposing an undue hardship on defendant Drayton.

(12) Under the present circumstances a geographic scope of the covenant not to compete confined to an area of one hundred (100) miles from the city limits of Philadelphia constitutes a restraint reasonably necessary to protect Alexander & Alexander without imposing an undue hardship on defendant Drayton.

(13) The defendant Drayton did not rely to his detriment on any statements made by John Sienkiewics in their meeting of April 4 or Mr. Sienkiewics' letter of April 10, 1974.

(14) The defendant Drayton did not rely to his detriment on any statements made by Mr. Sienkiewicz at the time of their meeting during the week of April 15, or any statements made in Mr. Sienkiewicz' letter to Mr. Drayton dated April 22, 1974 for the reason that Mr. Drayton had accepted employment with Warren & Welsh Company on April 11 or 12, 1974.

(15) The customer information at issue in this case constitutes trade secrets under Pennsylvania law.

(16) The limited publication of customer information by Alexander & Alexander as established on the record of this case does not preclude injunctive relief against further disclosure and competitive use of this information by defendants Drayton and Warren & Welsh Company.[2]

---

2. This Opinion constitutes my findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a). At this stage injunctive relief is not granted against Warren and Welsh on the basis of their representation that they will not hire Drayton in the event of the issuance of an injunction against Drayton. This refusal to issue an injunction against Warren and Welsh at this stage is without prejudice to an application for reconsideration if there is called to the Court's attention any conduct by Warren and Welsh which would be a violation of the principles announced in this Opinion. Similarly, the injunction issued is without prejudice to Drayton asking the Court one year from now for a modification on the basis of any changed circumstances which were not evident on the present record.