[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff, Legal Service Plans, Inc. seeks a preliminary injunction against the defendants, the law firm of Heneghan, Pikor, Kennedy and Allen and the members of that partnership, Michael H. Heneghan, Richard G. Pikor, Daniel H. Kennedy, Jr., and Gordon T. Allen.
The plaintiffs ask the court to prohibit the defendants from using information gained directly or indirectly from the plaintiff's customer lists for purposes other than those agreed to by the plaintiffs, from enrolling the plaintiff's customers in a legal services plan controlled by the defendants, and from using a certain toll-free telephone number. (As to this latter claim for relief, the plaintiff conceded at the conclusion of the hearing it had failed to meet its burden of proof, and the court will treat it as abandoned for purposes of this application only.)
The plaintiff alleges that the defendants are misappropriating the plaintiff's enrollment list and confidential information gained in the defendant's business relationship with the plaintiff to solicit members for a new, rival legal services plan set up by the defendant under the name Connecticut Family Legal Plan, Inc. Since 1982, the defendants have provided the actual legal services to enrollees in the plaintiff's prepaid legal services plan. CT Page 1094
The plaintiff claims a violation of the Connecticut Trade Secrets Act, 35-51b, C.G.S., violation of the Connecticut Unfair Trade Practice Act, 42-110b(a), C.G.S. et seq., breach of their contract with the plaintiff, breach of implied duties of good faith, fair dealing, loyalty, and confidentiality as to that contract, tortious interference with contractual relations and unjust enrichment.
The purpose of a preliminary injunction is to preserve the status quo and protect the movant from immediate and irreparable harm until the rights of the parties can be determined upon a full hearing on the merits of the claim for permanent in junctive relief. Olcott v. Pendleton, 128 Conn. 292, 295 (1941): Deming v. Bradstreet, 85 Conn. 650, 659 (1912).
In assessing what it termed the analogous situation of the granting of a stay of an administrative order in Griffin Hospital v. Commission on Hospitals and Health Care, 196 Conn. 451, 457
(1985), the Connecticut Supreme Court, citing Olcott v. Pendleton, supra, stated that entitlement to such preliminary relief requires a showing of 1) probable success on the merits of the claim and 2) a balancing of the results which may be caused to one party or the other from the granting of such temporary relief. The Court in Griffin Hospital, supra, at 488, also cited with approval, Covenant Radio Corporation v. Ten Eighty Corporation, 35 Conn. Sup. 1.3 (1977), which enunciates as additional requirement for temporary injunctive relief 3) irreparable injury and 4) lack of an adequate remedy at law.
The plaintiff proved the following facts with regard to the probability of success on the merits of the legal claims. Since 1982 the plaintiff has been engaged in the business of marketing and enrolling members in a prepaid legal services plan. It obtains enrollees by cultivating relationships with credit unions in Connecticut and obtaining their sponsorship and endorsement of the plan as well as access to their membership lists, the right to include marketing materials about the plan in the credit unions' mailings to members and the right to have payments for enrollment directly deducted from the account of the credit union member. In return for this access to credit union members, the plaintiff pledges that it will not use the credit unions' membership lists for any purpose other than marketing and administering its plan and that it will not, for example, sell the list, pass it along to others for other uses, or use it to market goods or services other than the prepaid legal services plan which it presents to the credit unions for scrutiny before obtaining their endorsement.
The administrator of the plaintiff spends considerable time and effort in soliciting approval from credit union officials, CT Page 1095 obtaining their endorsement, and soliciting enrollees from the membership lists they provide. In return for payment of seventy-five dollars, enrollees receive the right to obtain two free wills, to have simple legal questions answered over the telephone by an attorney, and to receive a reduced rate for more complex legal representation by the attorney. Enrollment is for a period of either one or two years at the option of the enrollee, and renewal is automatic unless the enrollee requests cancellation upon receipt of a notice shortly before the renewal date.
From the inception of the plaintiff's plan, it has provided the promised legal services to its enrollees via a contract with the defendants, who, in return, receive compensation on a per enrollee basis for each member whose contract entitles him or her to services. In addition, the attorneys receive access to the potential business resulting from plan members requesting services beyond those to which their annual membership fee entitles them.
The plaintiff provides enrollees in the plan with the toll-free number of a telephone at the defendants' law office, and it provides the defendants with a monthly list of the names of paid-up enrollees and the date their membership expires so that the law firm can determine whether a caller requesting services is in fact a member of the plan at the time of the request.
After approximately six years of supplying legal services to the plaintiff's enrollees, sometime in 1988 the defendants began to discuss with Robert Murtha, the administrator of the plaintiff, their intention of starting their own legal services plan. Initially, the defendants said they were considering creating a plan that would be higher-priced and aimed at a more affluent market than the plaintiff's plan. Without the plaintiff's knowledge, in 1988 the individual defendants formed a corporation called Connecticut Family Legal Plan, Inc., however, that corporation was dormant and conducted no business until 1990. In 1989, the plaintiffs and the defendant were discussing the renewal of the contract between them, which had a term of March 1, 1987 to February 28, 1990. In connection with this discussion, the defendants proposed buying the plaintiff's plan. As the expiration date of their contract approached, the defendants realized that the plaintiff might simply sign a contract with a different attorney for provision of services to plan members, and they negotiated an extension of their contract to April 30, 1990.
Without telling the plaintiff of their intention to do so, the defendants sent out a mailing in mid April 1990 to 1980 members of the plaintiff's plan and 2400 former members soliciting membership in the Connecticut Family Legal Plan.
The letter to present members identified the sender, a CT Page 1096 secretary in the defendants' law office, as "writing to you as your Plan representative of the Connecticut Family Legal Plan, Inc." and stated that the plan "is being offered to you as a credit union member and is being serviced by the law firm of Heneghan, Pikor, Kennedy Allen." The solicitation letter, which contained the salutation "Dear Legal Plan Member," stated that "[t]his firm has been your consulting attorney under the credit union plan for approximately the last ten years." The solicitation letter stated an enrollment fee of "only $45.00 per year as compared to $75.00 per year for the other plan."
The defendants' solicitation letter to former members of the plaintiff's plan (Ex. 0) began "[a]s a former member of the Credit Union Legal Services Plan, we are pleased to bring to your attention the Connecticut Family Legal Plan, sponsored by the law firm of Heneghan, Pikor, Kennedy Allen." The defendants offered former members the same $45.00 rate.
In addition to these two mailings, in May 1990 the defendants caused a solicitation letter to be mailed to one hundred fifty of the plaintiff's enrollees whose memberships they knew, on the basis of the membership list supplied by the plaintiff, were due to expire soon. The letter contained the following statements:
 I am writing to you as your Plan representative of the Connecticut Family Legal Plan, Inc. The Connecticut Family Legal Plan, Inc. is being offered to you as a credit union member and is being serviced by the law firm of Heneghan, Pikor, Kennedy Allen. This firm has been your consulting attorney for approximately the last ten years. . . . We look forward to continuing to serve you. [emphasis supplied] (Ex. P)
In addition to its mailings to the present and former enrollees of the plaintiff, the defendants purchased a mailing list and sent out solicitation letters to 10,000 people in their geographical area. In that solicitation, they stated the price of enrollment in their plan as $75.00, the same rate as the plaintiff's as opposed to the $45.00 discounted rate the defendants offered to the present and former members of the plaintiff's plan.
After the defendants' mailings went out, the plaintiff and two credit unions began to receive inquiries from enrollees, some of whom were confused about the letters they had received and some of whom were incensed that their names and status as credit union members had been revealed to a legal services plan other than the one endorsed by their credit union. CT Page 1097
The Chesebrough Ponds Federal Credit Union has withdrawn its endorsement of the plaintiff's plan because of communications from its workers concerning confusion over the status of the plan and breach of conditions of confidentiality.
Ann Nelson testified that she cancelled her enrollment in the plaintiff's plan upon her next renewal date because of confusion over whether the same plan she had joined was still in existence. Since the mailing of the defendants' solicitation letters to its members, the plaintiff has experienced a drop in enrollment of about 550 members, as opposed to the drop of 180 members it normally experiences as some present enrollees decide not to renew their memberships.
Likelihood of Success on the Merits
While the parties have briefed case law concerning the common law tort of misappropriation of trade secrets, in fact the complaint invokes the Uniform Trade Secrets Act, which was enacted in Connecticut in 1983. Misappropriation of a trade secret pursuant to the Uniform Trade Secrets Act, 35-50 C.G.S. et seq., includes "use of a trade secret of another without express or implied consent by a person who knows or has reason to know that his knowledge of the trade secret was acquired under circumstances giving rise to a duty to limit its use or was derived from a person who owed a duty to the person seeking relief to limit its use." The defendants contend that the names and addresses of the plaintiff's enrollees were derived not from materials supplied by the plaintiff but from their own files created when enrollees called to obtain legal services. Even if this is true as to names and addresses, it is not true as to the renewal date of members. This information, which was crucial to success in marketing to these members at the point at which they were most likely to be interested in a service plan, was supplied to the defendants on monthly membership lists and was not independently developed by the defendants for any purposes of supplying actual legal services.
The court finds that the defendants furnished this information to the new corporation they had created when they knew that Murtha, who had supplied the names and renewal dates to them, had a duty to keep all information about the Plan's members confidential. Additionally, the defendants also acquired the names and renewal numbers of plan enrollees "under circumstances giving rise to a duty to maintain its secrecy or limit its use " within the meaning of 35-51 (b)(2)(B)(ii) C.G.S. As early as 1983, Murtha had put the defendants on notice of his need to provide credit unions with assurances of confidentiality (Ex. I, J). Additionally, any and all information the defendants obtained CT Page 1098 about the plaintiff's enrollees was for the purpose of providing legal services and was subject to the general rules of confidentiality set forth in Rule 1.6 of the Rules of Professional Conduct. Disclosure to a marketing corporation such as Connecticut Family Legal Plan, Inc. of a list of its clients and information concerning them, including addresses and the date of expiration of a certain contract to which the clients were parties, would be prohibited by the rules of professional responsibility, a circumstance which independently gave rise to a duty to maintain its secrecy. Contrary to the defendants' argument, an attorney's ethical obligations to a client are not co-terminous with rules of evidence and discovery concerning identity of clients. ABA/BNA Lawyers Manual on Professional Conduct, 01:114. The plaintiff was entitled to rely on the defendants' independent obligation to guard the confidentiality of the enrollees as clients.
The plaintiff has further made the requisite showing that the information the defendants gave to Connecticut Family Legal Plan, Inc. was a "trade secret" of the plaintiff. The list of the plan's members and their renewal dates had value as information developed by the plaintiff's efforts. Mr. Murtha credibly testified as to the plaintiff's punctilious efforts to maintain the secrecy of its enrollment information, including requiring people who serviced its computers to sign a confidentiality agreement. When the new legal services plan solicited membership from persons on a purchased list of members of the public, it enrolled only 17 people after a mailing to 10,000. When it solicited enrollment from persons whom the plaintiff had already interested in a pre-paid plan for legal services, it had a dramatically higher success rate. This evidence demonstrated that knowledge of the date when the plaintiff's enrollees would again be in the market to choose a legal service plan was information which derived independent economic value from not being generally known by others or readily ascertainable by them by proper means.
Information relating to the timing of a customer's needs has been held to constitute a trade secret see Alexander 
Alexander, Inc. v. Drayson, 378 F. Supp. 824, 832 (E.D.Pa. 1974); Allen Dampf, P.C. v. Bloom, 512 N.Y.2d 116, 117 (1987).
While the defendants claimed that their solicitation was independently created by culling of names and addresses from their files only as to those enrollees of the plaintiff who had actually become their clients, that representation is not credible in view of the testimony of a member of the plaintiff's plan that she received a solicitation from the defendants though she had never called them at any time during her enrollment.
The court concludes that the plaintiff has made the CT Page 1099 requisite showing of probable success on the merits of its claim under the Uniform Trade Secrets Act. The plaintiff has also made such a showing with regard to its claim of tortious interference with the plaintiff's contractual relationship with its enrollees. Such a cause of action requires proof that the contractual relationship was disturbed by means which involved fraud, misrepresentation, intimidation or molestation. Sportsmen's Boating Corporation v. Hensley, 192 Conn. 747, 754 (1984).
The letters which the defendants caused to be sent to the plaintiff's enrollees were and were intended to be highly misleading, implying that the signer was associated with the same legal plan in which the addressees were already enrolled and that the new plan was sponsored by the credit unions.
It is not, of course, necessary that the plaintiff demonstrate likely success on the merits of every one of the causes of action raised in the complaint in order to obtain injunctive relief, and having found that the plaintiff has made the requisite showing as to two counts of the complaint, the court will not therefore go on to discuss the remaining theories. At any rate, the plaintiff's CUTPA claim concerns the text of the solicitation letters, a complaint which would not lead to the injunctive relief sought.
Balancing of Harm and other factors
As to the balancing of the equities, the plaintiff has established that solicitation of its enrollees is causing it harm not only in the form of loss of membership, but also in the destruction of its special relationship with a credit union on which it depends for its marketing efforts. Since the plaintiff's access to the membership lists of the credit unions was conditioned on the maintenance of confidentiality and the restriction of use of lists to the use of the plaintiff for a single specified purpose, the plaintiff has shown that the defendants' actions are likely to jeopardize its relationship with the sole market on which it depends for its success and existence.
By contrast, the harm to the defendants from the granting of the requested injunctive relief was shown to be no more than a delay in its plan to compete with the plaintiff in a very small part of the potential market available.
The plaintiff has no adequate remedy at law. If the defendants were to continue to solicit from the plaintiff's enrollment lists, the plaintiff might maintain successive and repeated actions for damages, however such relief cannot be characterized as adequate, especially given the extreme difficulties of proving the reasons for loss of each enrollee. CT Page 1100 Misappropriation of confidential information of the sort at issue here as been recognized as an appropriate subject for injunctive relief. Town and Country House and Homes Services, Inc. v. Evans,150 Conn. 314, 320 (1963).
The plaintiff has demonstrated entitlement to preliminary injunctive relief, and the court has issued an order setting forth the scope of that relief.
Beverly J. Hodgson, Judge.