**William R. KRAMER, Plaintiff,**

v.

**ROBEC, INC., Defendant.**

**Civ. A. No. 92–2302.**

United States District Court, E.D. Pennsylvania.

Aug. 10, 1992.

Order Denying Motion to Amend April 14, 1993.

Ronald H. Surkin, Media, PA, for plaintiff.

Douglas I. Zeiders, Stephen Bosch, Hamburg, Rubin, Mullin & Maxwell, Lansdale, PA, for defendant.

## OPINION AND ORDER

GAWTHROP, District Judge.

Plaintiff brings this diversity case, seeking relief from a restrictive covenant in his employment contract and damages for tortious interference in prospective contractual relations. The court, sitting without a jury, heard testimony and argument. Upon the following reasoning, I shall grant plaintiff's prayer in part and modify the terms of the covenant.

## FINDINGS OF FACT

1. The Plaintiff, William R. Kramer, is an individual citizen of the State of New Jersey.

2. The Defendant, Robec, Inc., is a Nevada corporation, whose principal place of business is located in Horsham, Pennsylvania.

3. Robec is a wholesale distributor of computer hardware and software, selling primarily to value-added resellers, with a sideline in developing and selling computer systems. It sells products in all fifty states and abroad.

4. In 1984, Kramer and Robec entered into an agreement to attempt to develop a commercially viable computer network system. Robec funded the project through a corporate entity known as Emex Technologies, Inc.

5. In the fall of 1986, Kramer and Robec agreed that the project would continue in-house at Robec, meaning that Emex Technologies, Inc. and Robec would merge, and on November 7, 1986 Kramer and his key engineers at ETI, became at-will employees of Robec.

6. On December 31, 1986, Robec presented Mr. Kramer with an employment contract, which contained the non-compete agreement at issue in this suit.

7. The non-compete agreement reads in pertinent part:

On termination of his employment, whether by termination of this agreement, by wrongful discharge or otherwise, employee, *for a period of three (3) years* after he has ceased receiving any compensation from employer under this agreement, *will not engage, either directly or indirectly,* in any manner or capacity, as principal, agent, partner, officer, director, employee, joint venturer, salesman, consultant, corporate shareholder of more than then (10) percent of the shares of any corporation, or otherwise, enter into or engage generally in any activity, or otherwise, enter into or *engage generally in any activity competitive with the business of employer in the United States of America.* (Agreement ¶ 10) (emphasis added)

8. The Agreement recites that the restrictive covenant was "for and in consideration of good and valuable consideration, specifically for one thousand dollars ($1,000.00), receipt of which is paid and hereby acknowledged ..." (Agreement ¶ 9)

9. The agreement contains a hand-written, initialed amendment to ¶ 6, which reads, "This agreement may be terminated at any time after twenty-four (24) months from the date of this agreement by either party for any reason whatsoever by the giving of one hundred eighty days (180) prior notice in writing."

10. This amendment fundamentally changed the terms of Kramer's employment from an at-will employee to an employee for a term, at minimum of 2 and ½ years, unless he was dismissed for cause.

11. At Robec, Mr. Kramer worked as a manager of a project to develop a commercially viable computer network system, in the form of two products: StackLAN and Microstack. Mr. Kramer did not have sales, customer, nor marketing responsibilities at Robec, but was familiar with the Robec's marketing strategy.

12. StackLAN is a peer-to-peer Local Area Network (LAN), which uses NET BIOS and SMB technology for inter-computer communication and file-sharing.

13. Microstack is a dedicated server network system which also uses NET BIOS and SMB to allow sharing of a central information base.

14. StackLAN is on the market; Microstack is not yet being sold, although its release has been announced.

15. On April 28, 1988, Robec created a limited partnership, called Emex, L.P., 30% of which was owned by Robec, and most of the balance by Emex, Inc., a newly created corporation the stock of which was owned by various employees of Robec, including Kramer.

16. At the same time, Emex, L.P., and Robec entered into a License Agreement whereby Emex granted to Robec a non-exclusive license to market, sell, and support Emex's products, including StackLAN and MicroStack. The License Agreement provided that the products and all related documentation were and would remain the property of Emex, and were the property of Emex, and were the confidential and proprietary to Emex.

17. Robec funded the projects to develop of StackLAN and MicroStack.

18. Robec's marketing analysis identifies LANtastic as one of the leading peer-to-peer Local Area Networks against which StackLAN competes.

19. Although LANtastic is also NET BIOS based, unlike StackLAN, it does not use the SMB technology.

20. Artisoft developed and sells LANtastic.

21. On November 14, 1991, Mr. Kramer wrote to Artisoft seeking employment.

22. On or about January 16, 1992, Artisoft offered Mr. Kramer a job as project manager to oversee the plans and development of LANtastic, a prime competitor of StackLAN.

23. By letter dated January 20, 1992, Kramer advised Robec of his intention to leave his job. He also told Robec that he planned to work for Artisoft and that the January 20, 1992 letter should serve as one hundred eighty day notice under the employment agreement.

24. Upon learning of Mr. Kramer's intention to accept a job with Artisoft, Robec, through its counsel, told him that Robec intended to enforce the restrictive covenant.

25. At trial, Robec's chief executive officer testified that it would not violated the restrictive covenant for Kramer to work for Novell, another company which develops and manufactures Local Area Networks, albeit with a different technology.

26. Because of the restrictive covenant, Mr. Kramer had to turn down the Artisoft offer, after he had accepted it and put his house up for sale.

27. On April 17, 1992, Mr. Kramer filed a complaint requesting declaratory relief that the restrictive covenant in the employment agreement is invalid, or, in the alternative, that his employment at Artisoft would not violate the covenant.

28. Mr. Kramer continued to work for Robec until June 17, 1992, when the 180 period expired.

29. Because of the pace of change in computer technology, computer products, and the know-how and marketing strategies behind them have a relatively short life, 12 to 18 months.

30. As a computer developer for more than 20 years, much of what Mr. Kramer brought to the job at Robec and takes to other jobs is his own experience and expertise.

## DISCUSSION

█ A restrictive covenant is a disfavored restraint on trade, but when it contains reasonable terms bargained for by the parties, like any other contracts, it is enforceable. The burden of proving unreasonableness is on the plaintiff. Here, the plaintiff asserts that this covenant was not supported by adequate consideration. In particular, he argues that the consideration recited in the contract, as originally drafted, $1000, is inadequate for a three-year non-compete agreement of nationwide geographic scope. Here, however, the contract was amended at the time of signing. It is true that the consideration clause was not revised. It would have been an clearer case, if it had been; but the contract must be construed as a whole. If all that had changed hands was $1000 for the restrictive covenant, then the adequacy of the consideration and the enforceability of the contract would be in serious doubt. Here, however, the contract conferred upon plaintiff an entirely new employment status. The day before he signed the contract, plaintiff could be fired at will; the day after, he was guaranteed 2½ years employment, terminable only for good cause, with six months' notice of severance by either employer or employee. A fundamental change in employment status is adequate consideration for a non-compete agreement incident to an employment contract. *Bryant Co. v. Sling Testing & Repair*, 471 Pa. 1, 369 A.2d 1164, 1168 (1977). Thus, the consideration for the covenant is adequate.

█ Plaintiff next asserts that Robec has no legally protected interest in the technology it claims plaintiff will compromise by working for competitors. In particular, plaintiff argues that Emex, L.P., is the owner of whatever trade secrets and technology that was developed for Robec's StackLAN and MicroStack projects, and that it is Emex that has a legally protected interest in these projects, and not Robec, which is a licensee of Emex's intellectual property. Closer examination of law and facts does not support this conclusion. Although a legally protected interest is included in the legitimate objects of a restrictive covenant, the legal standard for evaluating a restrictive covenant encompasses not only legally protected interests, but also "legitimate business interests of the employer." *See, e.g., Thermo–Guard, Inc. v.*

*Cochran,* 408 Pa.Super. 54, 596 A.2d 188, 194 (1991).

■ Here, Robec, a 65% limited partner in Emex, L.P., has conceived two projects and sponsored them for seven years at a cost of more than $2,000,000. In the last stages of their development, it contracted out some of the research to its former employees, who worked at an entity it created, Emex, L.P. Robec is undeniably a party with a great interest in reaping the returns from the R & D for these projects. In a rapidly developing field, like computer technology, a company may indeed find a non-compete agreement, reasonable in scope and adequately supported by consideration, to be necessary for the protection of its legitimate business interests.

■ The remaining issue, then, is whether the restrictive covenant is reasonable in scope. Since competition in the computer market is world-wide and since Robec distributes throughout the nation and overseas, the geographic extent of the covenant—the United States—is reasonable. However, because of the quick pace of obsolescence and technological innovation, three years' ban on competition is longer than necessary to protect Robec's interest in the products on which plaintiff worked. Judging from evidence about the shelf life of other computer technology, these products, in their current form, may be on and off the market in less than 12 to 18 months—that is, a year or more before plaintiff would be permitted to take work with a competitor. Since his notification of departure six months ago, the plaintiff has been cordoned off from these projects and the defendant's plans and strategies for marketing them. Whatever trade secrets or proprietary information the plaintiff may have, which may be of value to competitors, pertains to these products as of January, 1992. Thus, a two-year ban on competition, reckoned from the time of his notification of departure, would suffice to protect defendant's legitimate interests. Since the three-year term is not reasonably necessary to protect the employer's legitimate interest, the court shall exercise its equitable powers, *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 595,

351 A.2d 250, 254 (1976), and modify the covenant's duration to two years.

## CONCLUSIONS OF LAW

1. This Court has subject matter over this action, under 28 U.S.C. § 1332, based on diversity of citizenship.

2. This Erie-bound case is governed by Pennsylvania law.

3. Under Pennsylvania law, although restrictive covenants are a disfavored restraint on trade, a restrictive covenant that is part of an employment agreement is enforceable if it is supported by adequate consideration and the application of the covenant is reasonably limited in both time and territory. *Piercing Pagoda Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207, 210 (1976).

4. A fundamental change in the condition or status of employment is adequate consideration for a restrictive covenant. *Bryant Co. v. Sling Testing & Repair,* 471 Pa. 1, 369 A.2d 1164, 1168 (1977).

5. The December 31, 1986 agreement, which changed Mr. Kramer from an at-will employee to an employee for a term, at minimum of 2 and ½ years, unless he was dismissed for cause, was adequate consideration for the three-year restrictive covenant.

6. To be reasonably necessary for the protection of the employer, the restrictions must be designed to protect a legitimate business interest of the employer. *Thermo-Guard, Inc. v. Cochran,* 408 Pa.Super. 54, 596 A.2d 188 (1991).

7. Robec, a 65% limited partner in Emex, L.P., which owns the trade secrets and technology on which Mr. Kramer worked, has a legitimate business interest in these products, which it conceived and funded.

8. Because Robec and its competitors market their products in all fifty states, the geographic scope of the restrictive covenant is not unreasonable.

9. Where a covenant imposes restrictions broader than necessary to protect the employer, the court of equity may not only remove an offensive term, but may supply a new, limiting term and enforce the covenant as so modified. *Sidco Paper Co. v. Aaron,*

465 Pa. 586, 595, 351 A.2d 250, 254 (1976); *Bell Fuel Corp. v. Cattolico*, 375 Pa.Super. 238, 544 A.2d 450, 457 (1988).

10. In so doing, the court must balance the interest of the employee in his occupation and of the employer in his established business.

11. Mr. Kramer has worked on inter-computer communications most of his professional career. Robec is primarily a wholesale distributor of computer hardware and software. On the record, StackLAN and MicroStack are the only products it has tried to develop on its own. Given the breadth of the geographic scope and virtually unlimited categories of competition prohibited by the restrictive covenant, three years is a heavy burden on Mr. Kramer's ability to find work in his specialty. Since the scope of the restriction is disproportionate to the share of Robec's work and sales in the field of local area network development, the restrictive covenant should be modified.

12. Because of the fast pace of obsolescence, often 12 to 18 months, in the computer industry and the fact that Mr. Kramer has, since he gave notice of his resignation, been out of the know at Robec for nearly six months already, a period of two years from his notice of resignation appears sufficient to protect Robec's legitimate business interests.

13. Since Artisoft's product, LANtastic, is in direct competition with Robec's products, StackLAN and MicroStack, Mr. Kramer is barred by the restrictive covenant, as modified, from working for Artisoft.

14. Because the restrictive covenant barred Mr. Kramer from working at Artisoft, Robec did not tortiously interfere with his prospective contract.

An order follows.

## ORDER

AND NOW, this 10th day of August, 1992, upon consideration of the submissions of counsel and after hearing and argument in open court, it is ORDERED that the Restrictive Covenant is MODIFIED to a term of two (2) years from Mr. Kramer's Notice of Resignation, for the reasons set forth in the accompanying memorandum. In all other respects, it is ORDERED that it is enforceable and shall be ENFORCED.

## ORDER

AND NOW, this 14th day of April, 1993, upon very careful consideration of Plaintiff William R. Kramer's Motion to Amend Findings of Fact, Conclusions of Law, and Order, under Fed.R.Civ.P. Rule 52(b), it is hereby ORDERED that Plaintiff's Motion is DENIED.*

---

\* With respect to the public domain argument concerning the master's thesis lodged in the library of Worcester Polytechnic Institute, I am unconvinced that that disclosure, albeit public, is of sufficient encompassing breadth to have given away the trade secrets thereby requiring me to void the injunction.

The testimony is diametric:
*William Kramer:*
"Q. Is the architecture of the Bus Interface Card, the BIC, available publicly?
A. Yes.
Q. Can you explain that?
A. There was a Master thesis written by the graduate students that worked on the BIC. In that thesis is an architectural view of the BIC....
Q. What is explained in that Master's thesis about the BIC and MicroStack?
A. That is over SRA, shared resource architectures. This is an overview of SRA. Its function-ality, and their block diagrams and architectural diagram of the BIC, including, I believe somewhere in here, as I remember, there is a block diagram of the various components that are on the BIC....
Q. And in Chapter three, beginning on page 37, is there essentially full disclosure of the design of the Bus Interface Card?
A. I would certainly say so. It identifies most all the major components that are on the BIC....
Q. Is that a very—how detailed a description is that?
A. That is fairly detailed. I would assume that an engineer who has some experience could look at that, and maybe not necessarily fully replicate the card, but come very, very close. You can see the components named. It is an NCR chip, which NCR—we are all aware who NCR is. They have a chip, one of the main components identified as Z–80, dual port RAM, with a block

diagram and the distinction, I would assume an engineer could come pretty close to creating a BIC." (N.T. 1:87–90).

*Alexander Kramer, Vice–President of Systems Marketing for Robec:*

"A. The people at Worcester were given a specification to develop a bus interface controller or BIC board as we have called it, and they did that development, and after the development was complete, they had a graduate student that had worked on the project that wanted to do some comparisons of the BIC device with other parallel interfaces that Worcester had worked with. From a performance viewpoint they wanted to do a study, and use that as a basis for a Master thesis, which was done.

Q. Weren't you concerned about secrecy?

A. No, we were not, because it is only, they only had the information that they needed to have to do that study. They did not have the detailed information relative to the SMB as an example." (N.T. 2:39).

*Robert Beckett, President and Chief Executive Officer of Robec:*

"A. Well, the study at Worcester, we had attempted on two occasions to build the hardware necessary for the project. And both produced poor results. I am a graduate of Worcester Polytechnic. I am a trustee of Worcester Polytechnic. I talked to their engineering department, or their electrical engineering department about a research project that would help overcome the difficulties that we had in building this particular board, and I launched the project that would support a master degree educational individual to do the research work for us to get this board so that it would be reliable and usable as a product in the MicroStack development.

Q. Were you concerned about the secrecy or confidentiality with regard to the project?

A. Many of the issues of secrecy and confidentiality were because we could breakdown various elements of the total project, so that only Bill Kramer knew the total scope of the project, we weren't concerned about them understanding just pieces of it. In this case, the specifications that we gave Worcester and the capability of the hardware are just one of the elements necessary to make the whole thing work. They did not have the innards of the design, they did not have any total source code to the project. So therefore we did not feel that there was any knowledge there greater than the ability to produce the board that we had asked them to produce." (N.T. 1:188–189).

But on balance, I find the Alexander Kramer and Robert Beckett evaluations the more persuasive. This conclusion is reenforced when one considers that trade secrets in this case go beyond the hardware, into questions such as marketing strategies and production strategies. To those secrets as well, William Kramer was privy.

As for the remainder of the motion, I believe the balance struck in the restrictive covenant to have been in accordance with the law. I would not hesitate to change my earlier ruling, if I deemed it erroneous, but in this case I think I got it right the first time. Hence, this order.