**VECTOR SECURITY, INC., Plaintiff,**

v.

**Dwayne STEWART Jr., et al., Defendants.**

**No. CIV A–00–944.**

United States District Court, E.D. Pennsylvania.

March 8, 2000.

Eric J. Pritchard, Tannenbaum and Chanin, Philadelphia, PA, for Plaintiff.

### MEMORANDUM AND ORDER

KATZ, Senior District Judge.

On February 22, 2000 Plaintiff Vector Security, Inc. brought a motion for a temporary restraining order (TRO) and preliminary injunction before this court against defendants Dwayne Stewart, Jr., City–Wide Home Securities Services, Inc., and Cinnaminson Alarm Co. The court denied the motion for a TRO. *See* Order of Feb. 23, 2000. A hearing on the motion for the preliminary injunction was held on March 8, 2000. Although defendants were served with all papers, including the complaint, motion for the preliminary injunction, and notice of the hearing, neither they nor their counsel attended the hearing. Upon consideration of the submissions of plaintiff, and after the hearing, the court makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## I. Findings of Fact

Vector Security Systems, Inc. is a Pennsylvania corporation with its principal place of business in Pennsylvania. Dwayne Stewart, Jr. is a citizen of New Jersey. City–Wide Home Security Services, Inc. is a New Jersey corporation with its principal place of business in New Jersey. Stewart is an officer and director of City–Wide and owns all or substantially all of its stock. Stewart has also traded in the security alarm business under the name Cinnaminson Alarm Co., whose principal place of business is New Jersey. Vector seeks to enforce, through a preliminary and permanent injunction, a restrictive covenant in a dealer agreement entered into by Vector and City–Wide.

### A. Vector's Dealer Program

Vector is a company which provides security alarm services. Through its employees, independent contractors, or authorized alarm dealers, Vector facilitates the installation of a security alarm system in a subscriber's[1] residence or business. Vector then provides services to the subscriber, generally alarm monitoring services, for a monthly fee in accordance with a subscriber agreement.

Vector's dealer program has been in existence for seven years. Authorized dealers are independent alarm businesses that have entered into agreements with Vector and that essentially act as independent sales representatives. Dealers solicit subscribers, install Vector-approved alarm security systems, and obtain an executed standard security services agreement from the subscriber which they then sell to Vector. Once Vector accepts and executes a subscriber agreement from a dealer, the agreement becomes binding upon Vector, and the dealer earns its right to receive a commission for that agreement. Vector calculates price of the subscriber agreements it purchases from its dealers by multiplying the monthly fee by a number previously agreed upon by both parties.

The multiplier varies and is dependent on a number of factors.

Each subscriber agreement that Vector purchases from its dealers has a term of thirty-six months and an automatic renewal provision for an additional thirty-six months. Vector anticipates that it will not receive a return on its investment until it has provided approximately sixty months of service to the customer. Accordingly much of Vector's incentive to enter into these agreements is its expectation, based on past experience, that subscribers remain with Vector for a considerable amount of time; the average, in fact, is fifteen years. Vector also generates substantial revenue from additional equipment and services for which its subscribers contract, as well as referrals from its subscribers. Vector anticipated that the attrition rate for subscribers obtained through its dealer program would be 10% per year, although the actual rate it has experienced is somewhat lower. It's overall net attrition rate of subscribers it has obtained from all sources is 7.6% per year.

### B. Dealer Agreement between Vector and City–Wide

In June 1999, Stewart submitted an application to become a Vector authorized alarm dealer to Ronald LiPari, a Vector senior vice-president. LiPari visited City–Wide's office in New Jersey and then met with Stewart in Philadelphia to negotiate a dealer agreement. On June 24, 1999, Stewart executed the dealer agreement, and LiPari executed the agreement on behalf of Vector on June 28, 1999.

Vector agreed to purchase subscriber agreements from City–Wide, subject to specific terms and conditions. Subscribers were required to have an acceptable credit rating score. City–Wide was responsible for verifying the subscriber's credit rating and including the score with subscriber agreements it submitted for purchase. The multipliers used to calculate the purchase price of the agreements ranged from

---

**1.** Customers are generally referred to as "subscribers" in the alarm security industry.

twenty-nine to thirty-four. City–Wide agreed that Vector would withhold a portion of a subscriber agreement's purchase price (holdback). Vector would retain the holdback for twelve months in order to guarantee the subscriber's performance. If the subscriber canceled during this time period, Vector would deduct the total amount of the purchase price payable to City–Wide from the holdback. During a ninety-day probationary period, the holdback amount was twenty percent. After the probationary period, the holdback was ten percent. The probationary period was imposed because Stewart had a high attrition rate when he sold subscriber agreements to Vector through another authorized dealer.

The dealer agreement prohibited City–Wide from soliciting or accepting subscriber agreements from renters[2] and from modifying the standard subscriber agreement. The dealer agreement also specified that City–Wide was to handle all service calls received from the subscriber for the first twelve months following installation. The dealer agreement provided that Vector had the right to terminate the agreement for any or no reason upon thirty days written notice to City–Wide. During the ninety-day probationary period, Vector had the right to terminate the agreement on ten days notice. City–Wide also agreed that for five years after the dealer agreement's expiration or termination for any reason, neither it nor its employees would "solicit, directly or indirectly[,] or cause any other entity to do so, Vector customers to buy or install any products or services which are of a similar type or serve the same purpose or perform the same function as the products and services covered by this agreement." Dealer Agreement between Vector and City–Wide ¶ 13.1.

### C. Termination of the Dealer Agreement by Vector

In September 1999, Vector learned that ITI, City–Wide's equipment supplier, refused to extend any additional credit to City–Wide. Vector only allowed its dealers to install equipment from ITI or DSC and believed that City–Wide lacked the expertise to install DSC alarm equipment. Thus, Vector was concerned that ITI's refusal to ship equipment would severely affect City–Wide's ability to sell and install security alarm systems. From late summer until the termination of the agreement on October 13, 1999, Vector also received a number of complaints about City–Wide from subscribers whose agreements it purchased from City–Wide. The complaints included allegations that City–Wide failed to service the systems it installed, that City–Wide failed to provide promised free products or services to the subscribers, and that the subscribers were unable to reach City–Wide. Vector itself was unable to contact anyone at City–Wide: telephone calls to the City–Wide office were answered by a voice-mail recording, and, generally, the voice-mail would not accept any messages because it was full. The few voice-mail messages left by Vector staff did not generate any response by City–Wide.

In the first week of October, LiPari ordered his staff to conduct a survey of the accounts Vector had purchased from City–Wide. The survey revealed that many of the subscribers Vector obtained through City–Wide were renters rather than homeowners and that Stewart or other City–Wide employees had told the subscribers that, if queried by Vector, they should say that they owned their home. LiPari also learned that City–Wide's liability insurance had been canceled due to its failure to pay the premiums. On October 13, 1999, LiPari sent written notice to City–Wide

**2.** Renters are undesirable customers in the home security industry because they often move before the terms of their subscriber agreements expire, they often do not have the authority to approve the material alterations to the premises that may be necessary in order to install the security equipment, and an alarm company is often unable to retrieve its equipment after a renter moves.

terminating the dealer agreement effective immediately. LiPari cited the cancellation of City–Wide's insurance and "the fact that your place of business has not been open for weeks now[.]" Oct. 13, 1999 Ltr. from LiPari to Stewart.

During the time the dealer agreement was in effect, Vector purchased 232 subscriber agreements from City–Wide for which it paid more than $179,000. Vector withheld approximately $40,000 and to date, Vector has deducted $39,495.09 from the holdback for cancellations and other amounts due to Vector by City–Wide pursuant to the dealer agreement.

### D. Violation of the Restrictive Covenant

Upon receiving the termination letter, Stewart left a voice-mail message for LiPari in which he threatened to take back his customers. In February 2000, an employee of Stewart's new alarm company, Cinnaminson Alarm Co., contacted LiPari. The employee gave LiPari a list of customers Stewart had directed her to contact. The names and addresses on this list are subscribers whose contracts Vector purchased from City–Wide and Vector has lost almost all of these subscribers. After Vector instituted this action, Stewart admitted to LiPari that he converted subscribers whose contracts he had sold to Vector by convincing them to cancel their Vector agreements and contract with other alarm companies. Currently, ninety-seven of the accounts Vector purchased from City–Wide have been cancelled or otherwise lost.

### II. Conclusions of Law

In order to prevail on a motion for a preliminary injunction, the movant bears the burden of demonstrating (1) a reasonable probability of success on the merit; (2) that it will be irreparably injured if relief is not granted to prevent a change in the status quo. A court should also consider, where relevant, (3) the effect of granting or denying relief on other interested persons; and (4) the public interest. *See Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir.1994); *ECRI v. McGraw–Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987). While state law applies to the substantive issues in this diversity action, federal law governs the standards for issuing a preliminary injunction. *See Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir.1989).

### A. Probability of Success on the Merits

Vector has demonstrated that it has a reasonable probability of success on the issue of the covenant's enforceability. Under Pennsylvania law,[3] a covenant not to compete is enforceable if it is: "(1) ancillary to the main purpose of a lawful

---

**3.** The dealer agreement does not specify what law governs it. A federal court, sitting in diversity, applies the choice of law rules of the forum state. *See Klaxon v. Stentor Elect. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). "Under general conflict of laws principles, where the laws of two jurisdictions would produce the same result on the particular issue presented, there is a 'false conflict' and the court should avoid the choice-of-law question." *Williams v. Stone*, 109 F.3d 890, 893 (3d Cir.1997). Here, there is a false conflict since either state would apply Pennsylvania law to the contract. New Jersey applies the law of state that has the most significant connections with the transaction and the parties. *See Kaufman v. Provident Life and Cas. Ins. Co.*, 828 F.Supp. 275, 282 n. 10 (D.N.J.1992). Similarly, Pennsylvania applies the law of the place with the most

interest in the contract and that is most intimately concerned with the outcome. *See Atlantic Paper Box Co. v. Whitman's Chocolates*, 844 F.Supp. 1038, 1042 (E.D.Pa.1994). In this case, although one party to the contract is a Pennsylvania citizen and the other a New Jersey citizen, the terms of the contract were negotiated in Pennsylvania and the parties intended that it would be performed primarily in Pennsylvania. *See* Vector Security Dealer Agreement, Ex. C ¶ 14 (specifying that City–Wide was to direct its marketing efforts so that 50% or more of the installations were to be in the 215 area code). Under the law of either state, Pennsylvania law governs the dealer agreement.

In addition, Vector agrees that Pennsylvania law governs the contract. The defendants have not commented on this issue.

transaction; (2) necessary to protect a party's legitimate interest; (3) supported by consideration; and (4) appropriately limited as to time and territory." *Volunteer Firemen's Ins. Serv., Inc. v. CIGNA Prop. and Cas. Ins. Agency,* 693 A.2d 1330, 1337 (Pa.Super.1997).

The first and third requirements are easily satisfied. The non-competition clause was ancillary to the main purpose of establishing a dealer arrangement between the parties. The clause was adequately supported by consideration, namely Vector's agreement to purchase subscriber contracts from City–Wide.

■ Vector has also shown a probability of success on the second question, whether the clause was necessary to protect Vector's relationships with its customers. Vector obviously has a business interest in sustaining a long-term relationship with its subscribers. "Trade secrets of an employer, customer goodwill and specialized training and skills are all legitimate interests protectable through a general restrictive covenant." *Thermo Guard, Inc. v. Cochran,* 408 Pa.Super. 54, 596 A.2d 188, 193–94 (Pa.Super.1991) (finding injunction prohibiting former employee from contacting any of the employer's current or prospective customers to protect employer's interest in customer goodwill). Vector does not receive a return on its investment in a subscriber contract until after approximately sixty months of service.

■ The court should also examine the hardship to the defendants in evaluating the reasonableness of the covenant in protecting the plaintiff's business interest. When a non-competition covenant is part of an employment agreement, consideration of the employer's interest must be balanced against the need to avoid imposing an undue hardship on the employee.

*See Bettinger v. Carl Berke Assoc., Inc.,* 455 Pa. 100, 314 A.2d 296, 298 (1974); *Alexander & Alexander, Inc. v. Drayton,* 378 F.Supp. 824, 830 (E.D.Pa.1974).[4] While the covenant limits to some degree the customer base from which the defendants may draw, the clause does not prohibit them from working in the alarm security field or from competing with Vector for new subscribers. Enforcement of the covenant will reasonably protect Vector's legitimate interests without imposing an unreasonable hardship on defendants.

■ The court also finds that the plaintiff has demonstrated a reasonable chance on prong four. While consideration of the applicant's business interest and the reasonableness of the covenant's scope are generally separate inquiries, they are necessary interdependent. "Thus, reasonableness in time or reasonableness in geographic extent are not separate constellations to the other balancing test of weighing the protection of the employer against an undue hardship on the employee." *Alexander & Alexander,* 378 F.Supp. at 831. Moreover, where the covenant imposes restrictions that are broader than necessary to protect the party seeking enforcement, the court may exercise its equitable powers and modify the restrictions. *See Kramer v. Robec, Inc.,* 824 F.Supp. 508, 512–13 (E.D.Pa.1992); *Sidco Paper Co. v. Aaron,* 465 Pa. 586, 351 A.2d 250, 254 (1976); *Bell Fuel Corp. v. Cattolico,* 375 Pa.Super. 238, 544 A.2d 450, 457 (1988). "In order to do equity between the parties by balancing the interest of the employee in his occupation and of the employer in his established business, the court must have the flexibility to award the employer reasonable protection, although not all the

---

4. In contrast, a restrictive covenant which is ancillary to the sale of a business is held to a less stringent standard. *See Alexander & Alexander, Inc. v. Drayton,* 378 F.Supp. 824, 829–30 (E.D.Pa.1974). Here, the dealer agreement governs a relationship that is closer to an employment relationship than one between

the seller and buyer of a business. While City–Wide was an independent entity, it acted, in large part, as Vector's sales representative, and therefore the hardship the covenant imposes on the defendants is weighed against the plaintiff's interests.

protection for which he may have contracted." *Bell Fuel*, 544 A.2d at 457.

Here, the covenant does not specify any geographical scope. Accordingly, the court will exercise its equitable powers and restrict the covenant to the territory described in the dealer agreement-Eastern Pennsylvania, Delaware, and South New Jersey.

As to duration, the court finds that five years is a reasonable time period. As noted, the covenant does not bar defendants from working in the security alarm business but only prohibits the defendants' from soliciting Vector's customers for five years. *Cf. Kramer*, 824 F.Supp. at 512–13 (finding restriction of two years reasonable where covenant barred defendant from working in similar field). Given that the defendants may continue to work in their area of expertise, the five-year period of the restriction is reasonable.

**B. Irreparable Injury**

 Vector has met its burden of showing that a failure to grant the preliminary injunction would cause actual irreparable harm. Mere risk of irreparable injury is insufficient to sustain a motion for a preliminary injunction. Rather, the movant bears the burden of making "a clear showing of immediate irreparable (not merely serious or substantial) injury of a peculiar nature so that compensation in money cannot atone for it." *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 91–92 (3d Cir.1992). The defendants are actively soliciting the subscribers whose agreements City–Wide sold to Vector. Thus, there is an actual rather than speculative breach of the covenant. The harm suffered by Vector as a result of the defendants' continued solicitation of the Vector accounts cannot be easily quantified in economic terms. Generally, the harm caused by a breach of a covenant not to compete is difficult to assess for damages purposes. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Masri*, No. Civ. A. 96–CV–3804, 1996 WL 283644, at * 4 (E.D.Pa. May 28, 1996); *Records Ctr., Inc. v. Comprehensive Management, Inc.*, 363 Pa.Su-

per. 79, 525 A.2d 433, 436 (1987). Where, as in this case, the covenant seeks to prevent former employees from soliciting customers they obtained while working for their employers, this difficulty stems from the fact that the covenant seeks not only to prevent the sales that might result from the prohibited contact, but to prevent disturbing the established relationship between the employer and the customer. *See John G. Bryant Co. v. Sling Testing & Repair, Inc.*, 471 Pa. 1, 369 A.2d 1164, 1167 (1977) (holding that "unwarranted interference with customer relationships ... is unascertainable and not capable of being fully compensated by money damages"); *see also Masri*, 1996 WL 283644 at *4 (finding plaintiff would suffer irreparable harm if defendant is allowed to solicit plaintiff's customers). As described, Vector's business is premised on maintaining a long-term relationship with its subscribers. The relationship is also valuable to Vector because of the possibility that it may sell additional services to the subscribers or receive referrals to new customers. Thus, the total harm to Vector for the loss of a subscriber relationship cannot be predicted easily.

**C. Harm to Interested Parties and the Public Interest**

Issuing the preliminary injunction will not result in greater harm to the defendants or other interested parties and is generally in the public interest. As noted, the covenant does not prevent defendants from selling security alarm systems, but only from soliciting Vector subscribers. Vector customers remain free to terminate their relationship with the company and enter into a relationship with any other alarm business. The public at large will benefit from allowing Vector and defendants to compete freely for non-Vector customers. In addition, it is generally in the public interest to uphold an agreement freely entered into by the parties. *See National Bus. Serv. v. Wright*, 2 F.Supp.2d 701, 709 (E.D.Pa.1998). Consideration of the relative harm to the de-

fendant and the public interest favor granting Vector's motion for a preliminary injunction.

### III. Conclusion

Vector has demonstrated probability of success on the enforceability of the restrictive covenant and that it will be irreparably harmed if the preliminary injunction does not issue. The relative harm to interested parties does not favor denying the motion for preliminary injunction, and it is in the public interest to uphold the restrictive covenant. Accordingly, the court will grant Vector's motion.

An appropriate order follows.

### *ORDER*

**AND NOW,** this 8th day of March, 2000, upon consideration of plaintiff's motion for a preliminary injunction and its submissions, and after a hearing, it is hereby **ORDERED** that:

1. The motion is **GRANTED**. Until October 13, 2004, defendants Dwayne Stewart, Jr., City–Wide Home Securities Services, Inc., and Cinnaminson Alarm Co. are **ENJOINED** from directly or indirectly soliciting, or causing any other entity or person to solicit, any customer of Vector Security, Inc. in Eastern Pennsylvania, Delaware and South New Jersey, for the purposes of inducing any such customer to buy or install products or services that are similar to or serve the same or similar function or purpose as the products and services provided by Vector. Defendants are further **ENJOINED** from using for their own purpose any Vector customer information, or selling, conveying or transferring any Vector customer information to any third party. Defendants are **ENJOINED** from committing the afore-mentioned acts for period of five years from October 13, 1999.

2. The above-described preliminary injunction shall issue and take effect when the plaintiff posts security in the amount of $10,000, pursuant to Federal Rules of Civil Procedure 65(c) and 65.1.