**SIEMENS MEDICAL SOLUTIONS HEALTH SERVICES CORP.**

v.

**Brian J. CARMELENGO.**

**No. CIV.A.01–0816.**

United States District Court,
E.D. Pennsylvania.

April 12, 2001.

---

Larry R. Wood, Jr., Pepper, Hamilton & Scheetz, Philadelphia, PA, for Plaintiff.

Jane O. McCahill, White and Williams, Philadelphia, PA, for Defendants.

## MEMORANDUM

O'NEILL, District Judge.

Plaintiff Siemens seeks to enforce a restrictive covenant contained in an employment agreement signed by its former employee, defendant Brian Carmelengo. Before me is plaintiff's motion for a preliminary injunction as well as defendant's motion to dismiss the complaint for failure to state a claim. Plaintiff's motion for an injunction will be granted in part and denied in part and defendant's motion to dismiss will be denied.

## BACKGROUND

Shared Medical Systems Corporation ("SMS") was a provider of software applications and consulting services for the healthcare industry until July 2000, when Siemens Corporation acquired all the stock of SMS and changed the name of the corporation to Siemens Medical Solutions Health Services Corporation ("Siemens"). Brian Carmelengo was employed by SMS/Siemens from January 3, 1989 to January 21, 2001. Before beginning at SMS, Carmelengo signed an employment agreement dated December 28, 1988. Section four of the agreement is a general confidentiality provision prohibiting the employee from disclosing trade secrets and other confidential information. Section 4(b) states: "upon and subsequent to termination of his employment hereunder for any reason whatever [the employee] will not, at any time, make any use whatever of ... Restricted Information,[1] either on his own or in conjunction with or on behalf of any other person or entity." Section five is a covenant not to compete for one year following the employee's termination date and requires the employee not to engage in any employment or line of business that is "substantially similar" to the duties he or she performed for SMS or would require the employee to disclose or use restricted information. The covenant in section five also limits contact with any current or former customers of SMS, stating:

---

1. "Restricted Information" is defined by the agreement as confidential information or trade secrets.

(b) for a period of one year from the date of ... termination, EMPLOYEE will not, on behalf of himself or any competitor ..., compete for, or engage in the solicitation of any customer of EMPLOYER ... or any person or entity that EMPLOYEE has, during the year immediately preceding such termination, solicited or serviced on behalf of EMPLOYER ... or that has been solicited or serviced, during such period, by any person under EMPLOYEE's supervision.

EMPLOYEE's obligation under this section ... shall extend to all geographic areas of the world in which EMPLOYER or any of its related companies, is offering its services, either directly or indirectly, through licenses or otherwise.... Provided, however, that if EMPLOYEE's duties ... involve only sales and/or marketing, EMPLOYEE's obligation ... shall extend only to that geographical territory for which he had significant sales, marketing or supervisor responsibility at any time during the year preceding the date of termination of his employment hereunder.

Section 12 of the agreement states that it is governed by Pennsylvania law.

Carmelengo started out at SMS as a programmer and over the next several years received a number of promotions. In 1994 he was promoted to the position of Senior Network Consultant, also known as a Technology Sales Consultant, which was primarily a sales position. On April 15, 2000 he was promoted again to New Business Sales Representative, also a sales position.

Cerner Corporation is a competitor of Siemens and sells health information systems and services to hospitals and businesses in the healthcare industry. On January 24, 2001, Siemens' corporate counsel, Michelle Nofer, wrote to Cerner's corporate counsel, Tanya Wilson, informing her that SMS understood that Cerner had made an offer of employment to Carmelengo and advising her of Carmelengo's obligations under his employment agreement. Wilson responded by stating that Cerner believed hiring Carmelengo would not be in violation of his employment contract with Siemens because he would be working in a territory—Wisconsin and Illinois—in which he had not been involved with SMS/Siemens. Siemens disagrees, maintaining that these states were part of Carmelengo's sales territory while an employee at SMS/Siemens. Specifically, according to Siemens, in his position as a Senior Network Consultant (a position he held from January 1, 1998 until April 15, 2000) Carmelengo was responsible for selling SMS technology services to specific customers in the Midwest Valley Region, which included Illinois, Wisconsin, Minnesota, Iowa, North Dakota and South Dakota and the Missouri Valley Region which included Kansas City, Nebraska and Missouri. Siemens also asserts that following his promotion to New Business Associate on April 15, 2000, Carmelengo was placed in charge of selling SMS products and services to new customers in Missouri and Illinois. Carmelengo continued to work for Siemens until January 29, 20001. He has since accepted an offer of employment with Cerner.

On February 16, 2001, plaintiff moved for a temporary restraining order and a preliminary injunction. On March 9, 2001, defendant moved to dismiss Siemens' complaint. On March 26, 2001 Siemens filed an amended complaint containing claims against Carmelengo for (1) breach of contract and (2) breach of fiduciary duty. The complaint also included counts against both Carmelengo and Cerner Corporation for (3) misappropriation of trade secrets and confidential information, and against Cerner alone for (4) tortious interference with contractual relations, and (5) unfair

competition. Siemens seeks an injunction for a period of one year from January 29, 2001: (1) prohibiting Cerner from employing Carmelengo, (2) prohibiting Carmelengo from accepting or seeking employment with any person or entity engaged in the same or similar business as SMS, and (3) prohibiting Carmelengo from soliciting any customer or potential customer of SMS that Carmelengo solicited ·or served on behalf of SMS. Siemens also seeks: (4) a permanent injunction prohibiting Carmelengo from misappropriating SMS's trade secrets, (5) an injunction directing Carmelengo to return to SMS all information, documents, software, materials, work product, or equipment taken by him from SMS, and (6) compensatory, consequential and punitive damages in an amount to be determined at a trial of this matter.

There was a preliminary injunction hearing on March 27, 2001. At the hearing, plaintiff withdrew all claims against Cerner Corporation due to lack of subject matter jurisdiction.

## DISCUSSION

### I. Preliminary Injunction

Prior to granting a preliminary injunction the court must weigh four factors: (1) whether the movant has demonstrated a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured if the request for relief is not granted; (3) whether granting the preliminary relief will result in even greater harm to the non-movant; and (4) the public interest. *See Vector Security, Inc. v. Stewart,* 88 F.Supp.2d 395, 399 (E.D.Pa. 2000). Weighing these four factors I find preliminary injunctive relief is warranted. For the following reasons I hold that plaintiff has demonstrated a reasonable probability of success on the merits. Further, I also find that if injunctive relief is not granted plaintiff will suffer irreparable harm in the form of an erosion in the

business relationship Siemens has cultivated with customers Carmelengo serviced or was responsible for. Finally, the injunctive relief contained in this Order grants only the relief reasonably necessary to protect Siemens and avoids "greater harm" to defendant.

### II. Siemens May Enforce The Agreement

Defendant moves for dismissal under Federal Rule of Civil Procedure 12(b)(6) claiming that Siemens may not enforce the restrictive covenant against Carmelengo because it was not a party to his employment agreement. Rule 12(b)(6) requires a court to dismiss a complaint if it fails "to state a claim upon which relief ·can be granted." In assessing such a motion, I must construe the complaint in favor of the plaintiff by accepting all material allegations·of the complaint as true. *See Trump Hotels & Casino Resorts, Inc. v. Mirage Resorts, Inc.,* 140 F.3d 478, 483 (3d Cir. 1998). "A complaint should be dismissed only if, after accepting as true all of the facts alleged in the complaint, and drawing all reasonable inferences in the plaintiff's favor, no relief could be granted under any set of circumstances consistent with the allegations of the complaint." *Id.*

The crux of defendant's argument is that Siemens may not enforce any of the provisions contained in Carmelengo's employment agreement because that agreement was between Carmelengo and SMS. In other words Carmelengo contends that the purchase of one hundred percent of SMS's stock by Siemens in July 2000 constituted a de facto change in his employer with the result that he is no longer bound by the terms of his employment agreement. Under Pennsylvania law, restrictive covenants in employment agreements are not assignable to successor employers except as explicitly permitted by the agreement unless the employee

consented to the assignment. *See All–Pak, Inc. v. Johnston,* 694 A.2d 347, 351–52 (Pa.Super.1997). Since there was no such provision in the agreement signed by Carmelengo, he argues that SMS could not have assigned the restrictive covenant to Siemens. This argument assumes, however, that a corporation that undergoes a complete change in stock ownership is "a successor corporation" so that any restrictive covenants it seeks to enforce must be assigned to it by its predecessor. In support of this assumption defendant relies on *Joyner Sports Medicine Institute, Inc. v. Stejbach,* 45 Pa. D. & C. 4th 242, 249, 1999 WL 33116429 (1999) and *All–Pak.*

■ In *All–Pak,* an investment group called "Total–Pak, Inc." purchased all the assets of All–Pak, including the name, and changed its name to All–Pak, Inc. The *All–Pak* court refused to allow this new entity to enforce restrictive covenants made between "old" All–Pak and its employees, holding that restrictive covenants are not assignable absent the consent of the employee. Plaintiff points out that *All–Pak* involved an asset purchase whereas Siemens acquired SMS through a stock purchase, to which defendant replies: "Mr. Carmelengo contends that how plaintiff acquired [SMS]—whether through an asset acquisition or stock purchase—is of no moment to the public policy which disfavors enforcement of a covenant not to compete to which the acquiror was not a party." (Def.'s Rep.Mem. In Supp.Mot.Dism. at 1–

2.) Without commenting on the court's holding in *All–Pak* I note that it, as well as the public policy cited by plaintiff, does not address a more fundamental question before me, namely, is Siemens an "acquiror" of SMS? My review of Pennsylvania law reveals no Supreme Court precedent on what effect, if any, the sale of the majority of a corporation's shares has on covenants not to compete contained in the employment agreements of the corporation's employees. In order to predict how the Supreme Court of Pennsylvania would resolve this question of unsettled state law, I should consider "relevant state precedents, analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Markel v. McIndoe,* 59 F.3d 463, 473 n. 11 (3d Cir. 1995).

■ It is a basic tenet of corporate law that a change in stock ownership is merely a transfer of shareholder rights which does not, in and of itself, normally affect the existence of the corporate entity.[2] Under this rationale Carmelengo should not be released from his obligations under the restrictive covenants in his employment agreement, not because SMS assigned it to Siemens, or because Carmelengo consented to its enforcement by continuing to work for Siemens after the stock transfer, but because SMS and Siemens are merely two different names for the same corpo-

---

**2.** "The corporation is distinct from the individuals who comprise it (shareholders).[ ] Such entity subsists as a body politic under a special denomination, which is regarded in law as having a personality and existence distinct from that of its several members, and which is, by the same authority, vested with the capacity of continuous succession, irrespective of the changes in its membership...." Black's Law Dictionary 340 (6th ed. 1990). "The ownership by one corporation of all the shares of another corporation does not make the former the owner of the corporate property of the latter. The corporation owning such stock is as distinct from the corporation whose stock is so owned as the person is from the corporation of which he or she is the sole member." Victoria A. Braucher, 6A *Fletcher Cyc. Corp.,* § 2843 (1997). "[T]he ownership by one corporation of a majority of the shares of another does not give the former ownership of or a legal interest in the property of the latter, nor merge the two, nor destroy the legal identity or individuality of either." *Id.*

rate entity. In other words, Carmelengo should not be deemed to work for a new employer simply because the name of the corporation changed and the corporation's shares have changed hands.

Relying on *Joyner*, defendant disagrees. In that case one hundred percent of Joyner's stock was acquired by a company called Nova Care. Following the stock acquisition, the Joyner name continued to be presented to the public but Joyner existed in name only as a wholly owned subsidiary of Nova Care. The *Joyner* court held that as of the stock acquisition defendant employees were effectively terminated by Joyner and any restrictive covenants made between Joyner and its employees could not be enforced by Nova Care. The court did allow Joyner, which existed only as a shell corporation at the time of the litigation, to enforce the covenants as the original party to the employment agreement, holding them to run from the date of the stock acquisition. The *Joyner* court pointed to a number of changes that took place within the corporation in support of its holding that Nova Care was a successor employer including: (1) all employees were summoned to conferences at various locations where a Nova Care employee explained a new benefits package which represented a substantial loss over the old package (401K, educational benefits, and merit-based salary increases were affected, and some salaries were "capped"), (2) each employee was required to sign an acknowledgment that he had attended the meeting and that he had received a copy of the "Nova Care (Outpatient Division) Employee Handbook", (3) paychecks were issued by Nova Care, and (4) Nova Care was listed as "the employer" on the corporation's W–2 tax forms. *Joyner*, 45 Pa. D. & C. 4th at 245–46, 1999 WL 33116429.

Carmelengo asserts that substantial layoffs by Siemens shortly after the stock acquisition, the change in corporate name, and changes in the benefits package offered Carmelengo suggest a result similar to the court's holding in *Joyner*. I disagree. I attach no significance to the change in corporate name. It simply cannot be that merely by changing its name a corporation calls into question the validity of the employment agreements it has with its employees. Similarly, Carmelengo's misgivings regarding the layoffs, while perhaps giving him an incentive to explore other options, do not excuse him from continuing to honor his agreement. If Siemens had not bought the majority of SMS's stock and SMS decided to lay off a large number of people, it is clear that Carmelengo could not call into question the validity of his agreement. I do not see how a change in the identity of the majority shareholder alters this analysis. Finally, the testimony regarding Carmelengo's benefits established that the plan in effect before the acquisition was replaced by the Siemen's plan. Despite some differences with respect to particular benefits, I find nothing significant enough to conclude that Carmelengo no longer worked for the entity with whom he signed his original agreement. The *Joyner* court stated, "[t]he point of focus should not be on the relationship between the old employer and the new employer but rather as between the employee and the new employer." *Id.* at 249, 1999 WL 33116429. It is my belief that the Pennsylvania Supreme Court would hold in the case before me that the "old" employer and the "new" employer are one and the same and that Siemens may enforce the restrictive covenant Carmelengo signed with SMS because there has been no change in the corporate identity of his employer.[3] To the extent that

---

**3.** A number of courts have employed similar logic in upholding restrictive covenants. *See,* *e.g., Rogers v. Runfola & Assoc., Inc.,* 57 Ohio

this determination conflicts with the decision of the court in *Joyner,* I conclude that the Supreme Court of Pennsylvania would decline to follow that court's reasoning. I will now examine the validity of the agreement and the restrictive covenants contained therein.

### III The Agreement

■ In order to enforce a restrictive covenant under Pennsylvania law it must satisfy three requirements: (1) the covenant must relate to either the contract for the sale of good will or other subject property or to a contract for employment, (2) it must be supported by adequate consideration, and (3) the application of the covenant must be reasonably limited in both time and territory. *See Piercing Pagoda, Inc. v. Hoffner,* 465 Pa. 500, 351 A.2d 207, 210 (1976). When fashioning an injunction to enforce a restrictive covenant, trial courts have broad powers to modify the restrictions imposed on the former employee to include only those restrictions reasonably necessary to protect the ·employer. *See Morgan's Home Equipment Corp. v. Martucci,* 390 Pa. 618, 136 A.2d 838 (1957). As a restraint on an employee's trade, restrictive covenants are strictly construed against the employer. *See Jacobson & Co. v. International Environment Corp.,* 427 Pa. 439, 235 A.2d 612 (Pa.1967). Therefore in determining whether to enforce such a covenant, I must balance the interest the employer seeks to protect against the interest of the employee in being able to earn a living in his chosen occupation. *See All–Pak,* 694 A.2d at 351.

■ It is undisputed that the covenant binding Carmelengo was entered into in connection with his employment and the salary and benefits he received constituted adequate consideration. With respect to its scope, section five of Carmelengo's employment agreement contains a covenant not to compete for one year following the employee's termination date and requires the employee not to engage in any employment or line of business that is "substantially similar" to the duties he or she performed for SMS, or that would require the employee to disclose or use restricted information. The covenant also restricts contact with any current or former customers of SMS/Siemens for one year, ·"[p]rovided, however, that if [the· employ-

St.3d 5, 565 N.E.2d 540 (1991)(A sole proprietor formed a corporation, wholly owned by him, to run his business. The court held that a covenant not to compete signed with the sole proprietor was assignable to the corporation because the only change resulting from the incorporation was in the legal structure of the business, not in the business itself. The court also found it important that no additional burdens of employment fell upon the covenantor as a result of incorporation); *Seligman & Latz of Pittsburgh, Inc. v. Vernillo,* 382 Pa. 161, 114 A.2d 672 (1955) (An employer who entered into employment contracts with employees as a partnership was not precluded from enforcing covenants not to compete against those employees as a corporation that succeeded the partnership); *Alexander & Alexander, Inc. v. Koelz,* 722 S.W.2d 311 (Mo. App.1986) (The employer was merged into its parent owner which, as the surviving corporation, sought to enforce the covenants not to compete against the former subsidiary's employees. The employees contended that their employment contracts were personal service contracts and could not be assigned without their consent. The court, however, found no assignment to have taken place, reasoning that the merger was merely a formal transfer of the employer's business from one entity to another, that is, from a wholly owned subsidiary to an integrated component of the surviving corporation. The merger merely changed ownership from an indirect to direct form and the court concluded it did not affect the employer's business. The court could find nothing showing that the employee-covenantor's duties not to compete would be materially altered as a consequence of the merger since the change was merely in corporate personalities).

ee's] duties ... involve only sales and/or marketing, [the employee's] obligation ... shall extend only to that geographical territory for which he had significant sales, marketing or supervisor responsibility at any time during the year preceding the date of termination of his employment...." I find these restrictions to be reasonable in both duration and geographic scope.

Following his promotion to New Business Associate on April 15, 2000, Carmelengo was given responsibility for selling SMS products and services to new customers throughout Missouri and southern Illinois (Peoria and south). Northern Illinois was split between Carmelengo and another SMS/Siemens employee with assignments given on a customer by customer basis. In addition, he contacted one hospital, Bryan LGH, in Nebraska. Carmelengo held the position of New Business Associate until his departure from Siemens on January 29, 2001. Therefore, he will be enjoined from contacting or dealing with any of plaintiff's customers in Missouri and Illinois south of and including Peoria, as well as any customers assigned to him in Illinois north of Peoria and Bryan LGH in Nebraska. Because his responsibilities as a New Business Associate encompassed all of Siemens customers and potential customers in Missouri and southern Illinois, this relief includes customers in those regions that Carmelengo had not personally dealt with.

 Prior to his promotion to New Business Associate, Carmelengo had worked as a Senior Network Consultant, a more junior level sales position, selling SMS technology services in what Siemens termed the "Midwest Valley Region," which included Illinois, Wisconsin, Minnesota, Iowa, North Dakota and South Dakota; and the "Missouri Valley Region," which included Kansas City, Nebraska and Missouri. He will therefore be enjoined from contacting or otherwise attempting to solicit any customers he solicited, serviced or contacted while employed as a Senior Network Consultant for SMS for a period of one year, to run from April 15, 2000. As he was not given regional sales responsibility in this position, this injunction does not cover all of Siemens' customers but only those with whom Carmelengo had contact.

 Section four of the agreement precludes Carmelengo from disclosing trade secrets or other confidential information, and specifically prohibits him from making use of such information, either on his own or in conjunction with or on behalf of any other person or entity. Plaintiff maintains that this restriction bars Carmelengo from ever working for Cerner, or any similar industry, in any capacity that involves the solicitation of new business because he would be unable to do so without violating section four's confidentiality restrictions. I disagree. Such an interpretation uses the general language contained in section four of the agreement to invalidate the specific limitations contained in section five, effectively imposing a ban on Carmelengo from working in an area that is limitless in geographic scope or duration. I find that such an interpretation cannot be squared with the requirements of Pennsylvania law, under which a restrictive covenant may not be enforced unless it is "reasonably limited in duration and geographic extent." *All–Pak*, 694 A.2d at 350.

At the preliminary injunction hearing, in response to the question "your concern [sic] and being in this courtroom today is because of the ten months experience [Carmelengo] had with [the technology services] group?" Thomas Trestler, vice president of new business development at Siemens stated: "[m]y concern is that he's got a lot of competitive information about

my company from the years that he spent here, not just in the last ten months." Trestler also stated he was concerned with Carmelengo's access as a New Sales Representative to a marketing data base known as "Siebol," which, according to Trestler, contained "a great deal of demographic information about prospective buyers' locations, people, corporations; [essentially] any kind of demographic information you could possibly think of." Trestler maintained that at national sales meetings Carmelengo "would have gotten a lot of information ... about contracts, pricing, strategies, [and] competitive information [about SMS/Siemens]," and as a New Sales Representative "he would have been given ... high level information about where ... products and services were going to be evolving to" such as "which products and services were to be discontinued ... and in general ... high level information about ... [when and] where the next generation systems are going to be out, and which products and services may have a short shelf life." At the close of the preliminary injunction hearing, plaintiff's counsel summarized the essence of Siemens concern, stating: "The evidence ... has shown that Carmelengo had knowledge about SMS's pricing practices, he admitted at his deposition that he had knowledge about the margins, and he is in a unique position to bring all his knowledge to bear in the highly competitive world of health care information systems to the advantage of Cerner and to the disadvantage of SMS." Plaintiff's counsel argued further that given such knowledge "it's no accident that Cerner seeks to place Mr. Carmelengo in the very territory that he was assigned while working at Cerner . . . ."

 I will not enjoin defendant under section four of his employment agreement from ever being employed by an entity in the same business as SMS/Siemens.[4] Section five of the agreement provides all the protection to which Siemens is entitled. The restrictions contained in the Order accompanying this memorandum protect Siemens against any advantage Carmelengo might give to Cerner concerning Siemens' pricing practices or margins in the territory covered by the injunction. Further, they restrain Carmelengo from making use of any relationships he developed with Siemens' customers while employed as their representative. As they last for a year from the date of his termination, the restrictions also nullify any advantage Carmelengo might bring Cerner with respect to new products being introduced or old products being discontinued. The restrictions therefore prohibit Carmelengo from making use of the "restricted information" contemplated in section four. Carmelengo may work for Cerner so long as he abides by the restrictions set forth in the Order.

4. Under Pennsylvania law, in order to be entitled to injunctive relief against an employee for misappropriation of trade secrets, the employer bears the burden of demonstrating the following factors: (1) that there is a trade secret or secret process of manufacture; (2) that it is of value to the employer and important in the conduct of its business; (3) that by reason of discovery or ownership the employer has the right to use an enjoyment of the secret; and (4) that the secret was communicated to the employee while he was employed in a position of trust and confidence, under such circumstances as to make it inequitable and unjust for him to disclose it to others, or to make use of it himself, to the prejudice of his employer. *See Felmlee v. Lockett*, 466 Pa. 1, 351 A.2d 273, 277 (1976). Further, while an employer is entitled to protect its confidential information, "[g]enerally the information must be a particular secret of the employer, not a general secret of the trade, and must be of peculiar importance to the conduct of the employer's business." *Bell Fuel Corp. v. Cattolico*, 375 Pa.Super. 238, 544 A.2d 450 (1988).

Plaintiff's request for an injunction directing Carmelengo to return to Siemens all information, documents, software, materials, work product, or equipment taken by him from Siemens will be denied in light of the uncontroverted testimony that Carmelengo did not remove any such material when he left Siemens.

An appropriate Order follows.

### ORDER

AND NOW, this day of April, 2001, after the hearing on March 27, 2001, having reviewed the submissions and oral argument of the parties, and having found that plaintiff Siemens Medical Solutions will suffer immediate and irreparable injury for which there is no adequate remedy at law if the preliminary relief is not granted, it is ORDERED that:

1. Plaintiff's Motion for a Preliminary Injunction is GRANTED in part and DENIED in part:

 a. Pending further Order of the Court, defendant Brian J. Carmelengo for one year from January 29, 2001, the date of his termination as a New Business Sales Representative for plaintiff, is enjoined from contacting or dealing with any of plaintiff's customers in Missouri, Illinois south of and including Peoria, as well as any customers he was responsible for in Illinois north of Peoria and Bryan LGH in Nebraska.

 b. Pending further Order of the Court, defendant for a year from April 15, 2000, the date of his termination as a Senior Sales Consultant, also known as a Technology Sales Consultant, is enjoined from contacting or dealing with any of plaintiff's customers with whom defendant dealt while he was employed by plaintiff in that capacity in Illinois, Wisconsin, Minnesota, Iowa, North Dakota South Dakota, Nebraska, Missouri and Kansas City (Ka.).

 c. Plaintiff's request to enjoin defendant from commencing employment at Cerner Corporation or with any person or entity engaged in the same or similar business as SMS/Siemens is DENIED.

2. All claims against Cerner Corporation are DISMISSED for lack of subject matter jurisdiction.

3. Defendant's motion to dismiss is DENIED.